**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**JEANNA CANNAROZZO,**
**NICOLE LOPEZ, and AMY IVORY,**[1]
**on behalf of The Nemours**
**Foundation Section 403(B)**
**Plan, themselves, and all others**
**similarly situated,**

      **Plaintiffs,**

**v.**                     **CASE NO. 3:23-cv-0136-BJD-LLL**

**THE NEMOURS FOUNDATION,**

      **Defendant.**
_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

1.    This action seeks to protect the retirement savings of more than 13,000 employees of The Nemours Foundation ("Nemours") who are participants in The Nemours Foundation Section 403(B) Plan ("Plan").

2.    Nemours has a fiduciary duty to ensure that its Plan does not charge excessive compensation to Plan participants. But over the past six years, Plan participants have paid millions in excessive administrative compensation. The compensation is nearly ten times what it should have been. Plan participants will continue to pay grossly excessive compensation unless this action moves forward.

---

[1] Due to a scrivener's error, "Amy Ivory" was previously referred to as "Amy Rice" in the Original Complaint.

3.      In addition, Nemours has a fiduciary duty to prudently select and monitor investments offered through the Plan. The Plan is eligible – given its massive size and economies of scale – for discounted pricing on investments. Instead of taking advantage of favorable pricing, Nemours caused Plan participants to pay more for investments than what they were eligible for and more than what they should have paid.

4.      Named Plaintiffs, Jeanna Cannarozzo, Nicole Lopez, and Amy Ivory ("Plaintiffs"), bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), to enforce liability under 29 U.S.C. §1109(a), and to restore to the Plan all losses resulting from Nemours' breaches of fiduciary duty.

## JURISDICTION AND VENUE

5.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

6.      This judicial District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the District in which the Plan is administered, and where at least one of the alleged breaches took place.

## ERISA

7.      The ERISA fiduciary duty of prudence is among "the highest known to the law" and requires fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As a fiduciary to the Plan, Nemours is obligated to act for the

exclusive benefit of the Plan and to ensure that the Plan's expenses are reasonable. *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

8.     "ERISA is a remedial statute designed to protect the interests of plan participants and beneficiaries....Courts should not hasten to employ technical rules of pleading and practice to defeat that goal." *Degnan v. Publicker Industries, Inc.*, 83 F.3d 27, 30 (1st Cir. 1996). This principle favors liberal construction of pleadings. *Fitzgerald v. Codex Corp.*, 882 F.2d 586, 589 (1st Cir. 1989).

9.     While everyone who participates in a 401(k) plan pays compensation to maintain their account, industry insiders report that over 70% of people do not believe they pay any compensation. To help the public obtain a better grasp on compensation they pay in retirement plans, the Department of Labor passed regulations in 2012 that require plan administrators to disclose fee and expense information to plan participants. However, most plan participants are still in the dark concerning the actual amount of compensation they pay. The lack of understanding is not surprising. Often compensation is hidden from plain view. In many cases, plan providers do not make the compensation and expense disclosures that the Department of Labor requires.

10.     Such is the case here. The account statements that Nemours provides to its Plan participants do not disclose the actual dollar amounts of compensation

Case 3:23-cv-00136-BJD-LLL    Document 21    Filed 06/14/24    Page 4 of 56 PageID 321

paid to third party service providers, like Transamerica and its affiliates, by Plan participants. In addition, the Plan's Annual Form 5500 Department of Labor reports are supposed to identify the compensation paid to third parties, but as discussed below, they do not.

11.     Nemours fiduciary obligations with respect to the Plan are especially important because Plan participants cannot negotiate compensation charged to Plan participants. Plan participants must trust that Nemours will prudently do so. Nemours is also responsible for selecting investments and hiring service providers for the plan. These fiduciary decisions have the potential to dramatically affect the amount of money that participants can save for retirement. According to the U.S. Department of Labor, a 1% difference in compensation over the course of a 35-year career makes a difference of 28% in savings at retirement. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1-2 (Aug. 2013).

12.     That is, if a person placed $25,000 in a retirement account, made no other contributions to the account for 35 years, averaged a 7% return for 35 years, and paid .5% in compensation, the account balance will grow to $227,000. But if the compensation is increased by just 1%, the 1% increase costs a staggering $64,000, or 28% of the retirement savings.

13.     Accordingly, Nemours must engage in a rigorous process to control compensation and ensure that Plan participants pay no more than a reasonable level of compensation. This is particularly true for billion-dollar plans like the Plan here, which has the bargaining power to obtain the highest level of service and the

- 4 -

lowest compensation. The compensation rates available to billion-dollar retirement plans are orders of magnitude lower than the much higher retail compensation available to small investors.

14.     The entities that provide administrative services like recordkeeping and investments to retirement plans have a strong incentive to maximize their compensation. Each dollar in compensation paid from participants' retirement savings reduce by the same amount participants' retirement savings, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, monitor, and reduce the amount of compensation paid by the Plan to third-parties, including the Plan's recordkeeper.

15.     Plan fiduciaries must be cognizant that self-interested third parties seek to maximize compensation from plans, and fiduciaries may not simply accede to demands, or agree to quotes without negotiating or considering alternatives. To act in the exclusive interest of a Plan and not in the service providers' interest, fiduciaries must negotiate as if their own money was at stake.

**THE PLAN**

16.     The Plan is a qualified retirement plan commonly referred to as a 403(B) plan.

17.     The Plan is established and maintained under written documents in accordance with 29 U.S.C. §1102(a)(1).

18.    Nemours is a statutory fiduciary to the Plan.

19.    Eligible current and former employees of Nemours are eligible to participate in the Plan. The Plan provides the primary source of retirement income for many former Nemours employees.

20.    Defined contribution retirement plans are generally classified as follows: "Micro" plans (<$5 million in assets); "Small" plans ($5 million-<$50 million); "Mid" plans ($50 million-<$200 million); "Large" plans ($200 million-<$1 billion); and "Mega" plans (>$1 billion).

21.    According to the Plan's most-recently filed Form 5500 with the Department of Labor, as of December 31, 2022, the Plan had $915,855,083 in assets and 13,845 participants with account balances.

22.    Instead of leveraging the Plan's tremendous bargaining power to benefit Plan participants, Nemours caused the Plan to pay unreasonable and excessive compensation to third-party services providers, including Transamerica and its affiliates.

## EXHAUSTION IS COMPLETE

23.    As set forth in the Parties' Joint Motion to Stay this Case pending exhaustion of Plaintiffs' administrative remedies (ECF No. 8), and also in the multiple Joint Status Reports filed by the Parties (ECF Nos. 14-17) during the Court-entered stay during the exhaustion process, Plaintiffs have exhausted all pre-suit administrative remedies/processes.

## THE PARTIES

24.    Named Plaintiff Jeanna Cannarozzo is a former employee of Nemours, where she worked as an HR Legal Administrative Assistant from April 16, 2012, through February 2, 2021.   She is a Plan participant, and is currently invested in the following funds: Allspring Special Small Cap Value A (ESPAX), American Funds EuroPacific Gr R5 (RERFX), Carillon Eagle Mid Cap Growth I (HAGIX), Carillon Eagle Mid Cap Growth R5 (HARSX), DFA Emerging Markets I (DFEMX), Fidelity 500 Index Institutional Prem (FXAIX), Fidelity Mid Cap Index (FSMDX), Fidelity Small Cap Index (FSSNX), Fidelity Total International Index (FTIHX), Hartford International Opportunities R5 (IHOTX), MFS Growth R3 (MFEHX), MFS Mid Cap Value R3 (MVCHX), and Vanguard Equity-Income Adm (VEIRX).

25.    Named Plaintiff Nicole Lopez is a former employee of Nemours.  She is a Plan participant, and is currently invested in the following funds: Allspring Special Small Cap Value A (ESPAX), American Funds EuroPacific Gr R5 (RERFX), Carillon Eagle Mid Cap Growth R5 (HARSX), DFA Emerging Markets I (DFEMX), Fidelity 500 Index Institutional Prem (FXAIX), Fidelity Mid Cap Index (FSMDX), Fidelity Small Cap Index (FSSNX), Fidelity Total International Index (FTIHX), Hartford International Opportunities R5 (IHOTX), MFS Growth R3 (MFEHX), and Vanguard Equity-Income Adm (VEIRX).

26.    Named Plaintiff Amy Ivory is a former employee of Nemours.  She is a Plan participant, and is currently invested in the following funds: Allspring

Special Small Cap Value A (ESPAX), American Funds EuroPacific Gr R5 (RERFX), Carillon Eagle Mid Cap Growth R5 (HARSX), DFA Emerging Markets I (DFEMX), Fidelity 500 Index Institutional Prem (FXAIX), Fidelity Small Cap Index (FSSNX), Fidelity Total International Index (FTIHX), Hartford International Opportunities R5 (IHOTX), MFS Growth R3 (MFEHX), and Vanguard Equity-Income Adm (VEIRX).

## PLAINTIFFS HAVE STATUTORY
## AND CONSTITUTIONAL STANDING

27.     Plaintiffs have statutory standing under ERISA to bring this action because 29 U.S. §1132(a)(1) allows a plan participant to file a civil action which seeks relief on behalf of a plan. Here, the Plan suffered millions of dollars in losses caused by Nemours' fiduciary breaches. Plaintiffs allege that they and all Plan participants suffered the same losses resulting from Nemours' ERISA violations. All relief in this action sought by Plaintiffs is on behalf of the Plan.

28.     The Plan continues suffering economic losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiff and the Plan. The Plan is the victim of any fiduciary breach and the recipient of any recovery. *Id.* at 254.

29.     To be sure, 29 U.S. C. § 1132(a)(2) affords Plaintiffs standing to sue derivatively as participants of the Plan standing because they invested in least one fund within the Plan, and the Plan suffered injury at large, thus affecting Plan members uniformly and in the same ways.

30.    To establish Constitutional standing (Article III standing), Plaintiffs need only show a concrete and particularized injury flowing from Nemours' ERISA fiduciary breaches.

31.    Plaintiffs allege their individual accounts in the Plan suffered economic losses because their accounts were charged excessive amounts of money for compensation paid to third-party providers, including TransAmerica. Those charges to Plaintiffs' individual accounts would ***not*** have been incurred had Nemours discharged its ERISA fiduciary duties to the Plan and ensured compensation paid by the Plan to third-party providers, including TransAmerica was, in fact, reasonable. That money (millions of dollars in terms of the Plan as a whole) should have gone towards the Named Plaintiffs' and Plan participant's retirement and into their retirement accounts; instead, it was paid as excessive compensation to Transamerica and its affiliates for administrative services. Accordingly, Plaintiffs allege concrete and particularized economic injuries (loss of money). Plaintiffs also have standing because they are seeking injunctive and equitable relief on behalf of the Plan.

32.    Also on the issue of Article III standing, to the extent the Named Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, the Plaintiffs need only show a constitutionally adequate injury flowing from those decisions or failures. The Plaintiffs allege such an injury for each claim.

33.    By way of specific example, when direct compensation and indirect compensation are both considered, the Named Plaintiffs paid approximately $250 to $300 in compensation per-participant annually to Transamerica for recordkeeping and administrative services, when they should have paid no more than $25 to $30. Their retirement accounts were each assessed the excessive amounts identified above for compensation Defendant caused the Plan's participants to pay Transamerica for recordkeeping and administrative services, which would not have been incurred had Defendant discharged its fiduciary duties to the Plan and reduced the compensation paid to Transamerica to a reasonable level. Thus, the Plaintiffs and each class member suffered a concrete economic injury traceable to Defendant's imprudent actions and fiduciary breaches.

34.    Additionally, the Plaintiffs have standing as to Defendant's imprudent selection and retention of the "Challenged Funds" because the Named Plaintiffs invested in at least one of the "Challenged Funds." For example, Named Plaintiff Jeanna Cannarozzo is invested in the following "Challenged Funds": Allspring Special Small Cap Value A (ESPAX), American Funds EuroPacific Gr R5 (RERFX), Carillon Eagle Mid Cap Growth R5 (HARSX), DFA Emerging Markets I (DFEMX), Fidelity 500 Index Institutional Prem (FXAIX), Hartford International Opportunities R5 (IHOTX), MFS Growth R3 (MFEHX), MFS Mid Cap Value R3 (MVCHX).

35.    Similarly, Named Plaintiff Nicole Lopez is invested in the following "Challenged Funds": Allspring Special Small Cap Value A (ESPAX), American

Funds EuroPacific Gr R5 (RERFX), Carillon Eagle Mid Cap Growth R5 (HARSX), DFA Emerging Markets I (DFEMX), Fidelity 500 Index Institutional Prem (FXAIX), Hartford International Opportunities R5 (IHOTX), MFS Mid Cap Value R3 (MVCHX).

36.     Likewise, Named Plaintiff Amy Ivory is invested in the following "Challenged Funds": Allspring Special Small Cap Value A (ESPAX), American Funds EuroPacific Gr R5 (RERFX), Carillon Eagle Mid Cap Growth R5 (HARSX), DFA Emerging Markets I (DFEMX), Fidelity 500 Index Institutional Prem (FXAIX), and Hartford International Opportunities R5 (IHOTX).

37.     Therefore, the Named Plaintiffs and each member suffered a concrete economic injury traceable to Defendant's imprudent actions and fiduciary breaches.

38.     As a result of Defendant's actions, the Named Plaintiffs and each class members are entitled to restitution in the amount of the difference between the value of their account currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendant's breaches of fiduciary duty as described herein

## **CLASS ACTION ALLEGATIONS**

39.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between February 6, 2017, and the present (the "Class Period").

40.     The members of the Class are so numerous that joinder is impractical. According to the Plan's Annual Form 5500 for the year ending 2022, filed with the U.S. Department of Labor, there were 13,845 Plan participants with account balances as of December 31, 2022.

41.     Plaintiffs' claims are typical of Class members' claims. Like other Class members, Plaintiffs participated in the Plan and suffered injuries because of Nemours' ERISA fiduciary breaches. Nemours treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and Class members' claims arise out of the same conduct, policies, and practices of Nemours as alleged herein, and all members of the Class have been similarly affected by Nemours' ERISA violations.

42.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> A.     Whether Nemours is a fiduciary of the Plan;
>
> B.     Whether Nemours breached its fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.     Whether Nemours failed to prudently monitor other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.     Whether Nemours caused the Plan to pay excessive compensation for administrative services;
>
> E.     Whether Nemours caused the Plan to pay excessive compensation for investments;

F.      The proper form of equitable and injunctive relief; and

G.      The proper measure of relief.

43.    Plaintiffs will fairly and adequately represent the Class and retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other Class members. Plaintiffs are committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this action as a class action.

44.    This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Nemours. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

45.    In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Nemours has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANT CAUSE THE PLAN TO PAY EXCESSIVE COMPENSATION TO THE PLAN'S ADMINISTRATORS

46.    Plan administrative services are sometimes called recordkeeping services. The recordkeeper keeps track of the amount of each participant's investments in the various options in the plan, and typically provides each participant with a quarterly account statement. The recordkeeper often maintains a plan website or call center that participants can access to obtain information about the plan and to review their accounts. The recordkeeper may also provide access to investment education materials or investment advice. These administrative services are largely commodities, and the market for them is highly competitive.

47.    Nearly all recordkeepers in the marketplace offer the same range of services. Many of the recordkeeping services can be provided by recordkeepers at little cost.

48.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, recordkeepers vigorously compete for business by offering the best price.

49.    The cost of providing recordkeeping services depends mainly on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant

recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-participant basis.

50.     Compensation paid to the recordkeeper can be paid directly from plan assets, or indirectly by taking money from plan participants' individual accounts (or a combination of both).

51.     In a typical "direct" recordkeeping compensation arrangement, the plan contracts with a recordkeeper to obtain administrative services in exchange for a flat annual fee based on the number of participants for which the recordkeeper will be providing services, for example $30.00 per year, per plan participant.

52.     A flat price based on the number of participants in the plan ensures that the amount of compensation is tied to actual services provided and does not grow based on matters that have nothing to do with actual services provided by a recordkeeper, such as an increase in plan assets due to market growth, or greater plan contributions by employees.

53.     By way of illustration, a plan with 30,000 participants and $3 billion in assets may issue a request for proposal to several recordkeepers and request that the recordkeepers provide pricing based on a flat rate for a 30,000-participant plan. If the winning recordkeeper offers to provide the recordkeeping services at a flat rate of $30.00 in compensation per participant, per year, the fiduciary would then contract with the recordkeeper for the plan to pay a $900,000 direct annual fee (30,000 participants at $30.00 per participant). If the plan's assets double and

increase to $6 billion during the contract but the participant level stays constant, the recordkeeper's compensation does not double like the plan assets did.

54.    Such a flat per-participant agreement does not necessarily mean, however, that every participant in the plan must pay the same $30.00 in compensation from his or her account. The plan could reasonably determine that assessing the same compensation paid to the recordkeeper to all participants would discourage participants with relatively small accounts from participating in the plan, and that, once the aggregate flat fee for the plan has been determined, a proportional asset-based charge would be best. In that case, the flat per participant rate of $30.00 in compensation per participant multiplied by the number of participants would simply be converted to an asset-based charge, such that every participant pays the same percentage of his or her account balance.

55.    Recordkeepers in the marketplace offer an array of other fee and expense models. These often include some combination of dollar per head and asset-based approaches. Plaintiffs here are specifically not alleging that Nemours was required to use a direct payment arrangement – or any specific payment arrangement for that matter. Rather, Plaintiffs are simply providing details on how direct payment methods operate and provides these details to partially illustrate (together with all the allegations herein) that the compensation Plan participants are paying to its recordkeeper are excessive and that Nemours should have done more to investigate, monitor, request, negotiate, and secure reasonable compensation amounts charged to the Plan.

56.    Although as discussed further below, while the Plan has multiple recordkeepers,[2] the Plan's core recordkeeper is Transamerica Retirement Solutions ("Transamerica"). Transamerica receives direct and indirect compensation from the Plan.

57.    Transamerica receives direct compensation of at least $74.90 annually from Plan participants. A reasonable amount of compensation for recordkeeping ought to be no more than $25 to $30 annually.  Accordingly, Transamerica's direct compensation alone is nearly triple what it ought to be.  But it gets much worse.

58.    Transamerica also receives indirect compensation. Transamerica receives indirect compensation in two material ways. First, Transamerica receives indirect compensation via "float" on Plan participant money. Second, Transamerica receives indirect compensation via a practice known as revenue sharing.

59.    With regard to indirect compensation via float, Nemours agreed that anytime Plan participants deposit or withdraw money from their individual accounts in the Plan that the money will first pass through a Transamerica clearing account.  Plan participant money typically sits in Transamerica's clearing account for 2-3 days. Nemours also agreed Transamerica could keep the investment returns and/or any interest earned on Plan participant money while the money is

---

[2] The Plan's other recordkeepers include VALIC, Newport Trust Company, and Fidelity Investment Institutional.

in Transamerica's clearing account. This is a form of indirect compensation that Transamerica receives as the recordkeeper for the Plan. The Plan's Annual Form 5500 for the year ending 2022 shows that more than $171 Million dollars was transferred in and out of the Plan.

60.    Specifically, the Plan's 2022 Form 5500 provides that there were $112,655,918 in contributions to the Plan in 2022, and $58,870,844 in benefits payments paid out of the Plan in 2022. Thus, in 2022 alone, Transamerica earned interest and investment related revenue on more than $171 million of Plan participant money while the money was in Transamerica's account. But Defendant did not take any measures to understand, account for, negotiate, limit, or end altogether this excessive compensation collected by Transamerica from the Plan. A prudent fiduciary is required to do so under ERISA. Defendant's imprudence caused the Plan losses. Had Transamerica earned just 1% on the $171 million it would have pocketed $1,071,000 ($1.71 million) in 2022 alone from float alone. Over the six-year class period the float numbers alone translate to approximately $10,260,000 Transamerica pocketed in indirect compensation from the Plan.

61.    However, Nemours has not tracked, monitored, nor negotiated the amount of compensation Transamerica receives from income it earns on Plan participant money while the money is in Transamerica's clearing account. In fact, thus far the only information available to Plaintiffs related to float income proves Nemours was made aware that Transamerica would keep float income. Nemours breached its fiduciary duty of prudence by allowing Transamerica to receive

compensation from Plan participants without tracking, monitoring, or negotiating the compensation Transamerica collects from interest on participant money as to the float from the Plan, and because the amount of indirect compensation Transamerica receives via float is excessive relative to the services provided and relative to prudent options in the marketplace.

62.    Transamerica also receives indirect compensation via revenue sharing. In a revenue sharing arrangement, the amount of compensation for recordkeeping services to a plan is not based on the actual value of such services, instead compensation is based on the amount of assets in the plan, or amount of assets in certain investments in the plan. For example, the recordkeeper will agree to a fee that is tethered to the amount of assets in a plan. The compensation will grow to unreasonable levels if plan assets grow while the number of participants, and thus the services provided, does not increase at a similar rate. By way of example, if a recordkeeper contracts to receive one percent annually of assets in the plan as indirect compensation for a plan with 100 participants and $300,000 in plan assets, the recordkeeper would receive $3,000 per year in compensation, or $30.00 on a per plan participant basis. But if the plan assets increased to $300,000,000 – and the contract remains the same, the recordkeeper receives $3,000,000 per year in compensation, or $30,000 per plan participant. This would be an excessive fee by any measure.

63.    Revenue sharing, while not a per se violation of ERISA, can lead to massively excessive compensation if not properly understood, monitored, and

capped. If a fiduciary decides to use revenue sharing to pay for recordkeeping, it is required that the fiduciary (1) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (2) compare that amount to the price that would be available on a flat per-participant basis, or other compensation models that are being used in the marketplace, and (3) ensure the plan pays a reasonable amount of compensation..

64.    Self-interested recordkeepers prefer compensation agreements that allow them to receive "direct" and "indirect" payments for recordkeeping. Recordkeepers often tout the direct compensation they collect as being "reasonable" while they surreptitiously take more money from Plan participants via indirect compensation.  Such is the case here.

65.    Recordkeepers often attempt to construct their compensation agreements so that their compensation is not solely tied to any actual services, but to the amount of assets in a plan (*i.e.*, float and revenue sharing). That way, as Plan assets increase, so does the recordkeeper's compensation. Utilizing an approach that allows recordkeepers to collect compensation indirectly is not *per se* imprudent. Plaintiffs are not making a claim against Nemours merely because it allowed the Plan's recordkeeper to pocket direct and indirect compensation. However, as here when indirect compensation is left unchecked, it can be devastating for Plan participants. As one commentator noted, "[A]t worst, revenue sharing (one source of indirect compensation) is a way to hide compensation. Nobody sees the money change hands, and very few understand what the total

investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." *See* Justin Pritchard, "Revenue Sharing and Invisible Fees."[3]

66.    It is well-established that plan fiduciaries have an obligation to monitor and control compensation paid to the Plan's recordkeeper to ensure that such compensation remains reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid by the recordkeeper and per-participant compensation and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's compensation is reasonable.

67.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor

---

[3] Available at: http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited June 13, 2024).

the recordkeeping compensation paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

68.    Second, make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* compensation, including direct compensation and so-called "indirect" compensation through revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants. Additionally, to the extent prudent fiduciaries agree that recordkeepers receive interest or float income from funds transferred into or out of a plan, fiduciaries track and control these amounts as well.

69.    Third, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the compensation being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. This will generally include conducting a request for proposal ("RFP") process at reasonable intervals,

and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if a plan experiences an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

70.    Transamerica has been the Plan's core recordkeeper during the entirety of the Class Period.  The services offered by Transamerica are offered by all recordkeepers. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  All national recordkeepers have the capability to provide recordkeeping services at little cost to all large defined contribution plans.

71.    Simply put, in this case, the compensation Transamerica extracted from the Plan are excessive in relation to the specific services Transamerica provided to the Plan. Here Nemours failed to prudently manage and control the Plan's recordkeeping costs and other compensation paid to Transamerica.

72.    By way of specific example, Nemours failed to conduct RFPs at reasonable intervals.  Notably, in 2021 Nemours decided it *needed* to do an RFP, but as of the fall of 2023 still had not actually done one yet.

73.     By going through an RFP process annually, or at least every three years—rather than not at all—a prudent plan fiduciary can review the level of service provided by the recordkeeper and compare compensation in the marketplace to those being offered by the current recordkeeper. This also allows the plan fiduciary to negotiate with its current provider for a lower fee and/or move to a new provider to provide the same or better services for a more competitive and reasonable fee.

74.     Besides failing to engage in the RFP process, Nemours' own documents fail to accurately disclose how much Transamerica is paid from the Plan in terms of either direct and/or indirect compensation.  By way of specific example, in 2022 Nemours' Annual Form 5500 Report, which is mandatory disclosure that is supposed to provide accurate information and the Plan's fee and expenses, Nemours states in 2021, Transamerica was paid $1,037,021 in "direct compensation."

75.     Below is screenshot of the information reported as to Transamerica's $1,037,021 "direct compensation":

TRANSAMERICA RETIREMENT SOLUTIONS

13-3689044

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 12 15 28 37 38 50 54 59 61 62 63 64 65 | RECORDKEEPER | 1037021 | Yes ☒  No ☐ | Yes ☒  No ☐ | 0 | Yes ☒  No ☐ |

76.    Plans of similar size pay no more than $25 to $30 per year per participant for all recordkeeping compensation. Here, the "direct compensation" Nemours admits it caused the Plan to pay Transamerica in 2022 on a per participant basis ($74.90) nearly three times what a reasonable level of compensation should have been.

77.    Notably, in documents made available to Plaintiffs thus far, calculated on a per-participant basis, Nemours disclosed allowing Transamerica to charge the Plan the following in direct compensation: 2022 ($74.90); 2021 ($97.10); 2020 ($87.68); 2019 ($80.25); 2018 ($90.30); 2017 ($83.89); and, finally, 2016 ($65.22).

78.    While Nemours may dispute Plaintiffs' numbers as to direct compensation paid to Transamerica, Nemours has, in fact, admitted that when calculated on a per-participant basis, the recordkeeping compensation paid to Transamerica is as follows: 2017 ($77.20); 2018 ($76.64); 2019 ($62.06); 2020 ($60.84); 2021 ($68.24); and, finally, 2022 ($27.53). Thus, even by Nemours' own admission, it caused the Plan to pay excessive compensation to Transamerica for recordkeeping.

79.    However, during the Class Period, the direct compensation that Transamerica received from the Plan was indisputably far more than Nemours disclosed causing the Plan participants to pay.

80.    For example, just based on the amounts disclosed by Nemours in the Plan's Annual 5500 Reports from 2016 to 2022, Transamerica received at least the following direct compensation from the Plan:

- $1,037,021 for the year 2022 during which there were 13,845 Plan participants with active account balances—equivalent to $74.90 per participant annually;

- $1,285,336 for the year 2021 during which there were 13,236 Plan participants with active account balances—equivalent to $97.10 per participant annually;

- $1,025,415 for the year 2020 during which there were 12,652 Plan participants with active account balances—equivalent to $81.04 per participant;

- $905,170 for the year 2019 during which there were 12,085 Plan participants with active account balances—equivalent to $74.90 per participant annually;

- $930,261 for the year 2018 during which there were 10,984 Plan participants with active account balances—equivalent to $84.69 per participant annually;

- $695,553 for the year 2017 during which there were 9,092 Plan participants with active account balances—equivalent to $76.50 per participant annually; and

81.    But there's more, much more in fact, in terms of excessive compensation Nemours caused the Plan to pay Transamerica. As noted above, Transamerica did not receive only the direct compensation—it received even more compensation for recordkeeping services through indirect payments. However, those amounts are simply not disclosed to Plan participants, like Plaintiffs.

82.    For instance, Nemours includes their formula for the revenue sharing paid to Transamerica in its Form 5500, pasted below.  Transamerica is paid 48.50

basis points the Plan's assets invested MFS Growth R3 fund, stated to be $80,843,928 in the 2022 Form 5500. Thus, based on the Form 5500, Transamerica collected approximately $392,093.05 from the Plan in revenue sharing from this one fund alone. Nemours didn't limit TransAmerica's revenue sharing to one fund – Nemours allowed TransAmerica to collect revenue sharing compensation, in varying degrees, from eight (8) different funds[4] on the Plan's investment menu, as demonstrated below:

Indirect Compensation in the form of revenue sharing was paid to the following Service Providers:

| TRANSAMERICA RETIREMENT SOLUTIONS | 13-3689044 |
| NATIONAL FINANCIAL SERVICES | 04-3523567 |

Revenue amounts are shown in annualized basis points of plan assets invested in applicable fund

| Fund Family | Fund Name | Start Date | End Date | Revenue to Transamerica Retirement Solutions | Revenue to National Financial Services |
|---|---|---|---|---|---|
| ALLSPRING | ALLSPRING SPECIAL SMALL CAP VALUE A | 1/1/2022 | 12/31/2022 | 53.350 | 1.650 |
| AMERICAN FUNDS | AMERICAN EUROPACIFIC GROWTH R5 | 1/1/2022 | 12/31/2022 | 4.850 | 0.150 |
| CARILLON | CARILLON EAGLE MID CAP GROWTH R5 | 1/1/2022 | 12/31/2022 | 19.400 | 0.600 |
| DFA DIMENSIONAL | DFA EMERGING MARKETS | 1/1/2022 | 12/31/2022 | 1.940 | 0.060 |
| DODGE & COX | DODGE & COX INCOME I | 1/1/2022 | 12/31/2022 | 7.760 | 0.240 |
| HARTFORD | HARTFORD INTL OPPORTUNITIES R5 | 1/1/2022 | 12/31/2022 | 9.700 | 0.300 |
| MFS | MFS GROWTH R3 | 1/1/2022 | 12/31/2022 | 48.500 | 1.500 |
| MFS | MFS MID CAP VALUE R3 | 1/1/2022 | 12/31/2022 | 48.500 | 1.500 |

83.    Once again, while Nemours admits Transamerica is paid "indirect compensation," at the same time Nemours discloses that amount as "0" and then claims that Transamerica provided it with a "formula instead of an amount or estimated amount." The problem with this, of course, is that Nemours fails to provide to Plaintiffs or Plan participants the variables in the alleged formula. Thus, Plaintiffs and Plan participants are in the dark as to what that formula translates

---

[4] As further evidence of Nemours' breach of fiduciary duty, at least some of the same funds providing revenue sharing compensation to TransAmerica are on the Plan's Qualified Default Investment Alternative ("QDIA"), the "automatic" investment selections made for a participant joining the Plan, and remaining as such, until changed by the participant.

to in terms of the amount of "indirect compensation" plan participants are paying to Transamerica because it does not disclose the plan assets in each fund used to pay Transamerica indirect compensation.

84.    The indirect compensation paid to Transamerica is far greater than recognized reasonable rates for a plan with nearly $1 billion in assets. For instance, the Plan pays Transamerica as 53.350 basis points of the Plan assets in the Allspring Special Small Cap Value A fund.

85.    Given the growth and size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Transamerica.

86.    As to the plan at issue here, Transamerica performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping, and information management, including computing, tabulating, and data processing.

87.    The compensation described above was and remains excessive relative to the services that the plan provided because, in fact, the services that Transamerica provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive compensation being paid to the recordkeepers and taken corrective action.

88.     Looking at recordkeeping costs for other plans of a similar size as of 2021 (the middle of the class period) shows that the Plan was paying higher recordkeeping compensation than its peers – an indication the Plan's fiduciaries failed to appreciate the prevailing circumstances surrounding recordkeeping and administration compensation.    The chart below compares the Nemours 403(B) Plan to comparable plans with similar numbers of participants and assets under management for the year 2021 (the mid-point of the class period):

| Name of Plan | Record keeper | Total # partici pants | Dollar value of plan assets | Total reported record-keeping & admin istrative service costs | Cost on Per-partici pant basis[5] | Service codes |
|---|---|---|---|---|---|---|
| Parsons Corp. Retirement Savings Plan | Prud-ential | 13,857 | $1,950,803,322 | $345,582 | $24.93 | 13, 37, 50, 64 |
| ZF North America, Inc. 401(k) Savings Plan | Fidelity | 12,621 | $1,948,524,933 | $231,287 | $18.32 | 37, 60, 64, 65, 71 |
| Nemours Foundation Section 403(B) Plan | Trans-america | 13,236 | $1,033,492,449 | $1,285,336 | $97.10 | 12,15, 28, 37, 38, 50, 54, 59, 61, 62, 63, 64, 65 |

[5] R&A costs in the chart are derived from Schedule C of the Form 5500s and reflect fees paid to service providers with a service code of "15" and/or "64," which signifies recordkeeping fees. *See* Instructions for Form 5500 (2021) at pg. 27 (defining each service code), available at https://www .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2021-instructions.pdf.

| Discount Tire America's Tire Retirement Plan | Great-West Life | 14,563 | $1,040,215,692 | $75,000 | $5.15 | 15,37,50, 64 |
|---|---|---|---|---|---|---|

89.     Nemours' failure to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

90.     According to the Department of Labor, the applicable service codes translate as follows: 12 = Claims processing; 15 = Recordkeeping and information management (computing, tabulating, data processing, etc.); 28 = Investment management; 37 = Participant loan processing; 38 = Participant communication; 50 = Direct payment from the plan; 54 = Sales loads; 59 = Shareholder servicing fees; 61 = Finders' fees/placement fees; 62 = Float revenue; 63 = Distribution (12b-1) fees;64 = Recordkeeping fees; 65 = Account maintenance fees.[6] Service codes contained in a 5500 "describe both the kind of services provided and the type of compensation received."[7]

91.     Nemours caused its Plan to pay Transamerica excessive compensation for the same services Transamerica offered for much less to the comparator plans. Plaintiffs anticipate expert witness reports will expand on the benchmarking

---

[6] *See* Instructions for Form 5500 (2020) at pg. 27 (defining each service code), available at https://www    .dol.gov/sites/dolgov/files/EBSA/employers-and-advisers/plan-administration-and-compliance/ reporting-and-filing/form-5500/2020-instructions.pdf.
[7] *Id.*

herein and demonstrate conclusively that the Plan paid excessive and unreasonable compensation.

92.    The Annual Form 5500 Reports from these various plans also demonstrate that, in fact, many of the recordkeeping services offered by Transamerica to the Plan here are/were similar to the above comparator plans. In fact, they are nearly identical, but done for $25 or less, per participant, annually.

93.    The first comparator plan is the Parsons Corp. Retirement Savings Plan. It filed an Annual 5500 Report in 2021 reporting that its recordkeeper, Prudential, performed and was paid for the same kind of services which Nemours' recordkeeper, Transamerica, performed. More specifically, the Parsons' Plan reported its recordkeeper performed the following discrete activities in 2020 for which it collected compensation in the form of direct compensation: 13 = contract administrator; 37 = participant loan processing; and 64 = recordkeeping.

94.    By way of comparison, Transamerica, the recordkeeper for the Nemours Plan, performed several of the same core services Prudential performed for the Parsons' Plan, including 13 = contract administrator; 37 = participant loan processing; and 64 = recordkeeping.  However, participants in the Parsons plan paid only about $25 annually to Prudential in direct compensation while Nemours Plan participants paid at least $97.00 in 2021 to Transamerica (not including the funds from which they paid undisclosed indirect compensation to Transamerica).

95.    The same is true for the second comparator plan, ZF North America, Inc., 401(k) Savings Plan. The service codes from the ZF North's Annual 5500

Report indicates that ZF North's recordkeeper, Fidelity, performed the same core services for the ZF North Plan. This is demonstrated by the use of the 5500-service code "37," "64", and "65" when describing the kind of services provided and the type of compensation received by Fidelity for the ZF North Plan.  The only real substantive difference is that Fidelity performed the same work for the ZF North Plan at nearly one fifth of the cost Transamerica charged for the same services Transamerica performed for the Nemours Plan ($18 per-participant annually in record keeping for ZF North Plan versus $97 per-participant annually for Nemours Plan).

96.    Much of the same is true for the third comparator plan, Discount Tire/America's Tire Retirement Plan.  The plans are of similar size in terms of assets and participants.  However, Nemours caused its plan participants to pay nearly nineteen (19) times what Discount Tire's participants paid for the same work for the same size of plan ($5 per-participant annually in direct recordkeeping paid by Discount Tire Plan versus $97 per-participant annually in direct recordkeeping paid by Nemours Plan in 2021). This is demonstrated by the fact that both plans share the same core service codes, specifically 15, 37, 64, and 65, when describing the work Transamerica performed.

97.    Simply put, each of the above plans are comparable plans because the plans are of similar size in both participants and assets. Thus, based on the comparator plans, if the Plan were a standalone plan, with over 13,000 participants and approximately $1 Billion dollars in assets in 2021, Nemours should have been

able to negotiate a total recordkeeping fee of $25 to $30, at most, from the beginning of the Class Period to the present.

98.    As demonstrated by these benchmarks, considering that the recordkeeping services provided by Transamerica in this case are like those provided by all national recordkeepers, including Transamerica, Nemours' decision to cause the Plan and its participants to pay at least $97 in direct compensation to Transamerica in 2021, is both imprudent and in violation of ERISA. The same is true for the other amounts paid annually during the class period, which ranged from $58 to $97 per participant each year.

99.    And this, of course, is only the direct compensation Nemours admits to causing the Plan to pay Transamerica. Based on the documents available to Plaintiffs thus far, by adding the indirect compensation to the direct compensation paid to Transamerica, including the true total compensation paid to Transamerica was approximately $250 to $350 per participant. The Plan, due to its number of participants and assets, had the leverage to negotiate cheaper recordkeeping costs but failed to do so.

100.    In fact, another national recordkeeper not involved with this Plan, Fidelity, provided evidence supporting Plaintiffs' position on this discrete issue. Fidelity's own retirement plan was recently sued. In that case, the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this

Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D. Mass. 2020).

101.    Additionally, in the *Moitoso* case Fidelity went on to stipulate as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017, is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014, to the present).[8]

102.    The key takeaway from this stipulation by Fidelity is simple. Fidelity admitted the value of similar services ranged from between $14.00 to $17.00 per participant annually. Thus, for Nemours to permit Transamerica to charge its Plan more than $97.00 per participant annually in direct compensation alone is both imprudent and a violation of its fiduciary duty. When coupled with the indirect compensation, Nemours permitted Transamerica to charge the Plan upwards of $250 to $350 per year for recordkeeping.

---

[8] *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2.

103.  To be clear, even the $97.10 in direct compensation Nemours' documents prove it caused the Plan to pay as to the Named Plaintiffs and the putative class members in 2021 for recordkeeping and administrative services is, in fact, excessive for the specific services performed by Transamerica.

104.  As explained above, the services codes from the Nemours 5500 describe both the kind of services provided and the type of compensation received via utilization of the codes.  These recordkeeping services (many which appear to be duplicative) provided by Transamerica in this case are similar to those provided by all national recordkeepers, including Fidelity, to similar sized plans.

105.  Nemours could have and should have used the Plan's increasing size and long-standing relationship with Transamerica as bargaining power to reduce the Plan's recordkeeping costs.

106.  At a minimum, Nemours should have but failed to hire a consultant to benchmark the Plan's administrative costs or engaged in an objective, competitive process to hire a recordkeeper who would provide the same or similar services without pocketing excessive compensation from the Plan.  Nemours' failure to perform these basic, but prudent, fiduciary actions constitute a clear violation of ERISA.

107.  Nemours allowed excessive compensation to be paid to Transamerica during the Class Period because when the Plan's assets grew, so did Transamerica's compensation even though its duties, services, and costs did not grow in proportion. This ought to be beyond a good faith dispute. Indeed, according to the

Plan's Annual 5500 Report for year ending 2016, the Plan had assets of $401,484,057 (about $400 Million). According to the Plan's Annual 5500 Report for year ending 2021, the Plan had assets of $1,041,925,317 (about $1 billion). The Plan's assets have more than doubled in the past few years. Transamerica's indirect compensation has skyrocketed to excessive and unreasonable levels simply because the Plan's assets have increased.

108. Unlike Nemours, who utilizes four separate recordkeepers, Transamerica, VALIC, Newport Trust Company, and Fidelity Investment Institutional, prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

109. Use of a single recordkeeper is also less confusing to participants and avoids excessive recordkeeping fees charged to the Plans. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able

to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[9]

110.    Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendant continues to contract with *four* recordkeepers, Transamerica, VALIC, Newport Trust Company, and Fidelity Investment Institutional.  The inefficient and costly structure maintained by Defendant has caused Plan participants to pay and continue to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services. There is no loyal or prudent reason for Defendant's failure to engage in a process to reduce duplicative services and the fees charged to the Plan or to continue with four recordkeepers.

111.    In sum, given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, Nemours could have obtained for the Plan recordkeeping services that were comparable to or superior to the typical services provided by Transamerica at a lower cost had Nemours acted as a prudent fiduciary would have under the circumstances. But Nemours failed to do so and, as a result, violated its fiduciary duties under ERISA.

---

[9]    Available    at    http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

## EXCESSIVE INVESTMENT-RELATED COMPENSATION

112.   Nemours failed to prudently monitor and select proper share classes of multiple investments offered by the Plan. Investment companies offer pricing discounts to retirement plans. The discounts are offered mainly because investment companies recognize that trillions of dollars are invested through retirement plans and they want their investments to be offered by retirement plans, so they offer pricing discounts to retirement plans. The discounts are typically referenced by what is known as "share classes." The "retail" share class of an investment charges a higher price than a "retirement plan" share class. But in all other material aspects, the underlying investment is the same. Here, Nemours selected more expensive share classes than identical less expensive share classes of the same investments. Except for the extra fees, the share classes are/were identical. Plaintiffs estimate that Nemours' imprudent choices as to share classes resulted in millions of dollars in excessive compensation paid by the Plan and its participants.

113.   A prudent fiduciary must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options.

114.   The time period from 2016 through February 2023, during which Nemours maintained the imprudent investments identified herein in the Plan's menu, demonstrates that Nemours failed to prudently monitor and select proper share classes of multiple investments offered by the Plan. When, as here, a

fiduciary like Nemours fails to select prudent investments or fails to remove an imprudent investment from a plan within a reasonable time, a breach of ERISA's fiduciary duties occurs. *Hughes v. Nw. Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737, 742 (2022). As such, Nemours breached its fiduciary duty.

115.    Long before *Hughes*, the Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

116.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id.* § 2 comment.

117.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also*

Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

118.    Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

119.    As demonstrated by the chart below, in a multitude of instances during the Class Period, Nemours failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost.

120.    Unlike a claim premised on an imprudent choice between two different mutual funds that perform differently over time, a claim premised on the selection of a more expensive class of the same fund ***guarantees*** worse returns. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 451 (6th Cir. 2022)

121.    The two share classes will produce the same initial returns, but higher costs will erode the retail shares' gains and steepen any losses. As costs compound, the differential will grow each year. Over the long haul, management compensation, like taxes and inflation, are salient features of investment performance.

122.    During the Class Period, Nemours failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's target date funds and mutual funds, which were/are identical to the funds in the Plan in every way except for their lower cost.

123.    More specifically, as of December 31, 2022, the Plan's menu needlessly consisted of expensive target date and mutual fund share classes (collectively, "the Challenged Funds") offered by the Plan during the Class Period when, in fact, lower-cost share classes for the same funds were readily available:

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| American Funds Europacific Growth R5 (RERFX) | .52% | American Funds Europacific Growth R6 (RERGX) | .47% |
| Carillon Eagle Mid Cap Growth R5 (HARSX) | .73% | Carillon Eagle Mid Cap Growth R6 (HRAUX) | .64% |
| Columbia Income Opportunities Adv (CPPRX) | .71% | Columbia Income Opportunities Inst3 (CIOYX) | .59% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Dodge & Cox Income I (DODIX) | .41% | Dodge & Cox Income X (DOXIX) | .33% |
| Hartford International Opportunities R5 (IHOTX) | .80% | Hartford International Opportunities R6 (IHOVX) | .70% |
| MFS Growth R3 (MFEHX) | .85% | MFS Growth R6 (MFEKX) | .51% |
| MFS Mid Cap Value R3 (MVCHX) | .99% | MFS Mid Cap Value R6 (MVCKX) | .62% |
| Allspring Special Small Cap Value A (ESPAX) | 1.25% | Allspring Special Small Cap Value R6 (ESPRX) | .83% |
| DFA Emerging Markets I (DFEMX) | .36% | DFA Emerging Markets II (DFETX) | .34% |
| Fidelity 500 Index (FXAIX) | .015% | Fidelity Flex 500 Index (FDFIX) | .00% |
| Fidelity Balanced Fund (FBALX) | .50% | Fidelity Balanced K6 (FBKFX) | .32% |
| Fidelity Blue Chip Growth (FBGRX) | .76% | Fidelity Blue Chip Growth K6 (FBCGX) | .45% |
| Fidelity Capital Appreciation (FDCAX) | .83% | Fidelity Capital Appreciation K (FCAKX) | .75% |
| Fidelity Contrafund Fund (FCNTX) | .81% | Fidelity Contrafund K6 (FLCNX) | .45% |
| Fidelity Convertible Securities (FCVSX) | .67% | Fidelity Advisor Convertible Secs Z (FIQVX) | .63% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Fidelity Corporate Bond (FCBFX) | .44% | Fidelity Advisor Corporate Bond Z (FIKOX) | .36% |
| Fidelity Disciplined Equity (FDEQX) | .71% | Fidelity Disciplined Equity K (FDEKX) | .62% |
| Fidelity Diversified International Fund (FDIVX) | .99% | Fidelity Diversified Intl K6 (FKIDX) | .60% |
| Fidelity Dividend Growth Fund (FDGFX) | .48% | Fidelity Dividend Growth K (FDGKX) | .38% |
| Fidelity Emerging Asia Fund (FSEAX) | 1.18% | Fidelity Emerging Asia Z (FIQPX) | .84% |
| Fidelity Equity-Income (FEQIX) | .57% | Fidelity Equity-Income K6 (KEKFX) | .34% |
| Fidelity Europe (FIEUX) | .88% | Fidelity Advisor Europe I (FHJMX) | .86% |
| Fidelity Floating Rate High Income (FFRHX) | .68% | Fidelity Advisor Floating Rate High Income Z (FIQSX) | .62% |
| Fidelity Freedom 2010 (FFFCX) | .49% | Fidelity Freedom 2010 K6 (FOTKX) | .38% |
| Fidelity Freedom 2020 (FFFDX) | .58% | Fidelity Freedom 2020 K6 (FATKX) | .42% |
| Fidelity Freedom 2025 (FFTWX) | .62% | Fidelity Freedom 2025 K6 (FDTKX) | .44% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Fidelity Freedom 2030 (FFFEX) | .66% | Fidelity Freedom 2030 K6 (FGTKX) | .46% |
| Fidelity Freedom 2035 (FFTHX) | .71% | Fidelity Freedom 2035 K6 (FWTKX) | .48% |
| Fidelity Freedom 2040 (FFFFX) | .75% | Fidelity Freedom 2040 K6 (FHTKX) | .50% |
| Fidelity freedom 2045 (FFFGX) | .75% | Fidelity Freedom 2045 K6 (FJTKX) | .50% |
| Fidelity Freedom 2050 (FFFHX) | .75% | Fidelity Freedom 2050 K6 (FZTKX) | .50% |
| Fidelity Freedom Index 2025 Investor Class (FQIFX) | .12% | Fidelity Freedom Index 2025 Premier (FLIPX) | .06% |
| Fidelity Freedom Index 2035 Investor Class (FIHFX) | .12% | Fidelity Freedom Index 2035 Premier (FNIPX) | .06% |
| Fidelity Global Credit (FGBFX) | .70% | Fidelity Advisor Global Credit Z (FIQYX) | .61% |
| Fidelity Government Income (FGOVX) | .45% | Fidelity Advisor government Income Z (FIKPX) | .36% |
| Fidelity Growth & Income (FGRIX) | .57% | Fidelity Growth & Income K (FGIKX) | .49% |
| Fidelity Growth Company (FDGRX) | .79% | Fidelity Growth Company K6 (FGKFX) | .45% |
| Fidelity Growth Strategies (FDEGX) | .63% | Fidelity Growth Strategies K6 (FSKGX) | .45% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Fidelity Growth Discovery (FDSVX) | .77% | Fidelity Growth Discovery K (FGDKX) | .68% |
| Fidelity International Discovery (FIGRX) | .98% | Fidelity International Discovery K6 (FDKFX) | .60% |
| Fidelity International Growth (FIGFX) | 1.01% | Fidelity Advisor International Growth Z (FZAJX) | .89% |
| Fidelity International Index (FSPSX) | .035% | Fidelity ZERO International Index (FZILX) | .00% |
| Fidelity International Real Estate (FIREX) | .95% | Fidelity Advisor International Real Estate Z (FIKLX) | .79% |
| Fidelity International Small Cap (FISMX) | 1.02% | Fidelity Advisor International Small Cap Z (FIQIX) | .89% |
| Fidelity Investment Grade Bond (FBNDX) | .45% | Fidelity Investment Grade Bond ETF (FIGB) | .36% |
| Fidelity Japan (FJPNX) | 1.13% | Fidelity Advisor Japan Z (FIQLX) | .96% |
| Fidelity Latin America (FLATX) | 1.060% | Fidelity Advisor Latin America Z (FIQMX) | .85% |
| Fidelity Leveraged Company Stock (FLVCX) | .74% | Fidelity leveraged Company Stock K (FLCKX) | .65% |
| Fidelity Low-Priced Stock (FLPSX) | .82% | Fidelity Low-Priced Stock K6 (FLKSX) | .50% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Fidelity Magellan (FMAGX) | .68% | Fidelity Magellan K6 (FMKFX) | .45% |
| Fidelity Mid Cap Value (FSMVX) | .57% | Fidelity Mid Cap Value K6 (FCMVX) | .45% |
| Fidelity New Markets Income (FNMIX) | .80% | Fidelity Advisor New Markets Income Z (FGBMX) | .73% |
| Fidelity Overseas Fund (FOSFX) | .95% | Fidelity Overseas K (FOSKX) | .84% |
| Fidelity Puritan (FPURX) | .50% | Fidelity Puritan K6 (FPKFX) | .32% |
| Fidelity Real Estate Income (FRIFX) | .71% | Fidelity Advisor Real Estate Income Z (FIKMX) | .59% |
| Fidelity Short-Term Bond (FSHBX) | .45% | Fidelity SAI Short-Term Bond (FZOMX) | .31% |
| Fidelity Small Cap Growth (FCPGX) | 1.020% | Fidelity Small Cap Growth K6 (FOCSX) | .60% |
| Fidelity Small Cap Stock (FSLCX) | .90% | Fidelity Small Cap Stock K6 (FKICX) | .60% |
| Fidelity Small Cap Value (FCPVX) | .99% | Fidelity Advisor Small Cap Value Z (FIKNX) | .87% |
| Fidelity Total Bond Fund (FTBFX) | .45% | Fidelity Total Bond K6 (FTKFX) | .30% |
| Fidelity Total Emerg Mkts (FTEMX) | 1.12% | Fidelity Advisor Total Emerg Mkts Z (FIZNX) | .97% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Fidelity Total Market Index (FSKAX) | .015% | Fidelity Zero Total Market Index (FZROX) | .00% |
| Fidelity U.S. bond Index (FXNAX) | .025% | Fidelity Flex U.S. Bond Index (FIBUX) | .00% |
| Fidelity Value Discovery (FVDFX) | .80% | Fidelity Value Discovery K6 (FDVKX) | .45% |
| Fidelity Value (FDVLX) | .83% | Fidelity Value K (FVLKX) | .75% |
| Fidelity Value Strategies (FSLSX) | .86% | Fidelity Advisor Value Strategies K (FVSKX) | .75% |
| Fidelity Worldwide (FWWFX) | .92% | Fidelity Advisor Worldwide Z (FIZOX) | .81% |
| Vanguard Balanced Index Admiral (VBIAX) | .070% | Vanguard Balanced Index I (VBAIX) | .060% |
| Vanguard Inflation-Protected Secs Adm (VAIPX) | .10% | Vanguard Inflation-Protected Secs I (VIPIX) | .07% |
| Vanguard Long-Term Bond Index Admiral (VBLAX) | .070% | Vanguard Long-Term Bond Index Instl Plus (VBLIX) | .040% |
| Vanguard Pacific Stock Index Fund Admiral (VPADX) | .10% | Vanguard Pacific Stock Index Instl (VPKIX) | .08% |
| Vanguard Real Estate Index Admiral (VGSLX) | .12% | Vanguard Real Estate Index Institutional (VGSNX) | .10% |

| Fund in Plan | Expense Ratio | Lower Cost Share Class of Same Fund | Net Expense Ratio |
|---|---|---|---|
| Vanguard Small Cap Index Admiral (VXMAX) | **.050%** | Vanguard Small Cap Index I (FXCIX) | **.040%** |
| Vanguard Total Bond Market Index Admiral (VBTLX) | **.050%** | Vanguard Total Bond Market Index Instl Sel (VTBSX) | **.010%** |
| Vanguard Value Index Admiral (VVIAX) | **.050%** | Vanguard Value Index I (VIVIX) | **.040%** |

124.    Plaintiffs allege that this compensation Defendant caused the Plan to pay is excessive, ***not*** by virtue of its percentage, but because there are different versions of the same investment vehicle available to the Plan with identical managers, investments styles, and funds, which have lesser fees.

125.    As the table above illustrates, throughout the Class Period, Nemours should have known of the existence and availability of lower-cost share classes and should have promptly transferred the Plan's investments in such funds to the least expensive share classes.  However, Nemours failed to do so in a prudent manner, instead waiting many years before making any changes.

126.    When it selected the above funds, and any of the other funds with less expensive options, had Nemours simply compared the gross/net expense ratios of the challenged funds to the gross/net expense ratios for the less expensive share class funds identified above, as any prudent fiduciary would, Nemours would have

instead selected the less expensive, but ***identical share classes***, available to the Plan.

127.    The funds offered by the Plan were more expensive than the same funds that were available to the Plan — a claim nearly identical to one addressed by the Supreme Court recently in *Hughes*.

128.    Plan assets are being needlessly wasted and retirement savings frittered away. This is a classic breach of ERISA's fiduciary duty of prudence.

129.    A prudent fiduciary conducting an impartial review of the Plan's investments on a monthly, quarterly, or at least an annual basis, would have easily identified the prudent share classes available and transferred the Plan's investments in the above-referenced funds into lower-cost prudent shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Nemours failed to do so, in breach of its fiduciary duties.

130.    There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services nor benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

131.    Plaintiffs are not arguing that Nemours had a duty to scour the market to find and offer a cheaper investment. Instead, Plaintiffs simply allege that lower cost investments with the identical managers, investments styles, and stocks,

should have been considered by the Plan, particularly as it relates to the funds identified above.

## FIRST CLAIM FOR RELIEF
### *Breach of Fiduciary Duty of Prudence*

132.    Plaintiffs re-allege and incorporate by reference Paragraphs 46-131 of the Complaint as if fully set forth herein.

133.    As a fiduciary of the Plan, Nemours was and remains subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's compensation paid to service providers, including Transamerica, and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

134.    Nemours breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Nemours failed to monitor or control the excessive compensation paid for recordkeeping services. Additionally, Nemours did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and as to what was in the best interest of Plan participants as prudent fiduciary acting with the skill, diligence and in a like capacity (administering nearly $1 billion in retirement assets).

135.    Instead, Nemours selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

136.    Nemours also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and failed to act within a reasonable time to remove funds that should have been replaced with lower-cost share class funds.

137.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Nemours complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

138.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Nemours is liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Nemours' breaches as set forth in their Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### _Failure to Adequately Monitor Other Fiduciaries and Service Providers_

139.    Plaintiffs re-allege and incorporate by reference Paragraphs 46-131 of the Complaint as if fully set forth herein.

140.    Defendant is the named fiduciary with the overall responsibility for the control, management, and administration of the Plan, in accordance with 29 U.S.C. §1102(a).  Defendant is the Plan Administrator of the Plan under 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority

to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

141.    Given that Defendant had the overall responsibility for the oversight of the Plan, Defendant had a fiduciary responsibility to monitor the performance of the other fiduciaries and service providers, including those delegated fiduciary responsibility to administer and manage Plan assets.

142.    A monitoring fiduciary must ensure that its monitored fiduciaries and service providers are performing their obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. Defendant breached its fiduciary monitoring duties by, among other things:

   a.    Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

   b.    Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

c.   Failing to ensure that the monitored fiduciaries and service providers had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeepers and the amount of any revenue sharing payments; a process to prevent the recordkeepers from receiving revenue sharing that would increase the recordkeepers' compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.   Failing to ensure that the monitored fiduciaries and service providers considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

e.   Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

143.   Had Defendant discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Named Plaintiffs, and the other Class Members lost millions of dollars of retirement savings.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs, on behalf of the Plan and all Plan participants, respectfully request that the Court:

1.   Find and declare that the Nemours breached its fiduciary duties as described above;

2.    Find and adjudge that Nemours is personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

3.    Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

4.    Order Nemours to provide all accountings necessary to determine the amounts Nemours must make good to the Plan under §1109(a);

5.    Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

6.    Surcharge against Nemours and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

7.    Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

8.    Certify the Class, appoint the Plaintiffs as class representatives, and appoint the undersigned as Class Counsel;

9.    Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

10.    Order the payment of interest to the extent it is allowed by law; and

11.    Grant other equitable or remedial relief as the Court deems appropriate.

DATED this 14th day of June, 2014.

Respectfully submitted,

*/s/ Brandon J. Hill*

**BRANDON J. HILL**
Florida Bar Number: 37061
**LUIS A. CABASSA**
Florida Bar Number: 0053643
**AMANDA E. HEYSTEK**
Florida Bar Number: 0285020
**WENZEL FENTON CABASSA, P.A.**
1110 North Florida Ave., Suite 300
Tampa, Florida 33602
Telephone: (813) 337-7992
Facsimile: (813) 229-8712
Email: bhill@wfclaw.com
Email: lcabassa@wfclaw.com
Email: aheystek@wfclaw.com

**MARC R. EDELMAN, ESQ.**
Fla. Bar No. 0096342
**MORGAN & MORGAN, P.A.**
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone: 813-577-4722
Fax: 813-257-0572
Email: MEdelman@forthepeople.com

*Attorneys for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 14th day of June, 2024, the foregoing was electronically filed with the Clerk of the Court via the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<div align="center" style="margin-left:40%">

*/s/ Brandon J. Hill*
**BRANDON J. HILL**

</div>