UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

|  |  |
|---|---|
| JEANNA CANNAROZZO, NICOLE LOPEZ, and AMY RICE, on behalf of the Nemours Foundation Section 403(B) Plan, himself, and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>THE NEMOURS FOUNDATION,<br><br>        Defendant. | Case No.: 3:23-cv-136-BJD-LLL |

## DEFENDANT'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

**JACKSON LEWIS P.C.**
Lindsay Dennis Swiger, Esq.
Howard Shapiro, Esq. (*pro hac vice*)
Michael E. Holzapfel, Esq. (*pro hac vice*)
Adam R. Carlisle, Esq. (*pro hac vice*)

# TABLE OF CONTENTS

I.      INTRODUCTION. ............................................................................................1

II.     SUMMARY OF FACTS AND PROCEDURAL HISTORY. ........................3

    A.   The Parties and the Plan. ...........................................................................3

    B.   Investment Costs. ........................................................................................3

    C.   Recordkeeping Expenses and Float Revenue. .............................................4

    D.   Allegations in the FAC. ..............................................................................6

    E.   Procedural History. .....................................................................................8

III.    LEGAL STANDARD ........................................................................................8

    A.   Rule 12(b)(6) Pleading Standards................................................................8

    B.   ERISA's Prudence Standards.......................................................................9

    C.   Documents Considered on a Motion to Dismiss .........................................9

IV.     LEGAL ARGUMENT. .....................................................................................11

    A.   Plaintiffs' Recordkeeping Claim Fails. ......................................................11

        1.   The *Moitoso* Stipulation is not a meaningful benchmark ............................11

        2.   The Comparator Plans are not meaningful benchmarks ...........................12

        3.   Plaintiffs' remaining allegations are generally implausible .........................18

    B.   Plaintiffs' Share Class Claim Fails. ...........................................................19

        1.   Plaintiffs do not allege that their preferred, lower cost share classes were available to the Plan .................................................................................19

        2.   The FAC does not account for the benefits the challenged share classes conferred ...............................................................................................21

V.      CONCLUSION .................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) ..............................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................8

*Bickley v. Caremark RX, Inc.*,
461 F.3d 1325 (11th Cir. 2006)........................................................................10

*Cassell v. Vanderbilt Univ.*,
285 F. Supp. 3d 1056 (M.D. Tenn. 2018) ........................................................24

*Dimanche v. Lake County Sheriff's Office*,
2012 U.S. Dist. LEXIS 59665 (M.D. Fla. Apr. 30, 2012)................................10

*Dover v. Yanfeng US Auto. Interior Sys. I LLC*,
563 F. Supp. 3d 678 (E.D. Mich. 2021)............................................................17

*England v. Denso Int'l Am., Inc.*,
2023 U.S. Dist. LEXIS 131386 (E.D. Mich. Jul. 28, 2023) ..............................22

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
2019 U.S. Dist. LEXIS 160112 (S.D.N.Y. Sep. 18, 2019) ..................................5

*Forman v. TriHealth, Inc.*,
40 F.4th 443 (6th Cir. 2022) ............................................................................19

*Fritton v. Taylor Corp.*,
2022 U.S. Dist. LEXIS 222996 (D. Minn. Dec. 12, 2022)................................12

*Johnson v. Parker-Hannifin*,
2023 U.S. Dist. LEXIS 214747 (N.D. Ohio Dec. 4, 2023) ...............................19

*Johnson v. PNC Fin. Servs. Grp.*,
2021 U.S. Dist. LEXIS 149408 (W.D. Pa. Aug. 3, 2021)..................................12

*Kelley v. Fid. Mgmt. Trust Co. (In re Fid. ERISA Float Litig.)*,
 829 F.3d 55 (1st Cir. 2016) ...................................................................... 13

*Lard v. Marmon Holdings, Inc.*,
 2023 U.S. Dist. LEXIS 169206 (N.D. Ill. Sep. 22, 2023) ................................... 17

*Leimkuehler v. Am. United Life Ins. Co.*,
 713 F.3d 905 (7th Cir. 2013) ............................................................. 21, 22

*Mateya v. Cook Grp. Inc.*,
 2023 U.S. Dist. LEXIS 124838 (S.D. Ind. June 16, 2023) ........................... 12, 18

*Matney v. Barrick Gold of N. Am.*,
 80 F.4th 1136 (10th Cir. 2023) ................................................................... *passim*

*Matney v. Barrick Gold of N. Am., Inc.*,
 2022 U.S. Dist. LEXIS 73479 (D. Utah Apr. 21, 2022), *aff'd* 80 F.4th
 1136 (2023) ............................................................................................... 19

*Matousek v. MidAmerican Energy Co.*,
 51 F.4th 274 (8th Cir. 2022) ........................................................ 11, 15, 17, 18

*Meiners v. Wells Fargo & Co.*,
 898 F.3d 820 (8th Cir. 2018) ...................................................................... 10

*Moitoso v. FMR*,
 451 F. Supp. 3d 189 (D. Mass. 2020) .................................................. 7, 11, 12

*Moog Mktg., Inc. v. TD Bank, N.A.*,
 2019 U.S. Dist. LEXIS 18368 (M.D. Fla. Feb. 5, 2019) ..................................... 9

*Parmer v. Land O'Lakes, Inc.*,
 518 F. Supp. 3d 1293 (D. Minn. 2021) ........................................................ 20

*Probst v. Eli Lilly & Co.*,
 2023 U.S. Dist. LEXIS 19172 (S.D. Ind. Feb. 3, 2023) ...................................... 5

*Riley v. Olin Corp.*,
 2023 U.S. Dist. LEXIS 11771 (E.D. Mo. Jan. 24, 2023) ................................... 20

*Ruebel v. Tyson Foods, Inc.*,
 2024 U.S. Dist. LEXIS 139618 (W.D. Ark. Aug. 6, 2024) ................................ 17

*Sealy v. Old Dominion Freight Line, Inc.*,
 2024 U.S. Dist. LEXIS 88092 (M.D.N.C. May 16, 2024) ................................. 14

iv

*Sigetich v. Kroger Co.*,
2023 U.S. Dist. LEXIS 40359 (S.D. Ohio Mar. 9, 2023)....................................12

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ...............................................................10, 11, 15

*Starbuck v. R.J. Reynolds Tobacco Co.*,
349 F. Supp. 3d 1223 (M.D. Fla. 2018) ............................................................12

*Stengl v. L3Harris Techs., Inc.*,
2023 U.S. Dist. LEXIS 50692 (M.D. Fla. Mar. 24, 2023) .................................24

*Thompson v. Dixon*,
2023 U.S. Dist. LEXIS 195164 (N.D. Fla. Oct. 1, 2023)...................................24

*Tussey v. ABB, Inc.*,
746 F.3d 327 (8th Cir. 2014) ....................................................................... 14, 18

*Universal Express, Inc. v. United States SEC*,
177 F. App'x 52 (11th Cir. 2006)........................................................................3

*Wehner v. Genentech, Inc.*,
2021 U.S. Dist. LEXIS 26227 (N.D. Cal. Feb. 9, 2021) ....................................12

*Williams v. Centene Corp.*,
2023 U.S. Dist. LEXIS 58066 (E.D. Mo. Mar. 31, 2023)..................................12

## Statutes

29 U.S.C. § 1002(34)...........................................................................................3

29 U.S.C. § 1104(a)(1)(B).....................................................................................9

ERISA ....................................................................................................*passim*

IRC § 403(b) .......................................................................................................3

## Other Authorities

29 C.F.R. § 2560.404a-5(c)(2) .............................................................................5

29 C.F.R. § 2560.404a-5(c)(3) .............................................................................5

Rule 12(b)(6) .................................................................................................8, 9

v

## I.    **<u>INTRODUCTION</u>**.

Defendant The Nemours Foundation ("Nemours") respectfully submits this memorandum of law in support of its motion to dismiss Plaintiffs' First Amended Class Action Complaint ("FAC") (ECF No. 21).

Just over ten years ago, the U.S. Supreme Court explained in *Fifth Third Bancorp v. Dudenhoeffer* that, given the ease of second-guessing complex fiduciary decisions through costly and burdensome Employee Retirement Income Security Act of 1974 ("ERISA") litigation, the motion to dismiss serves a critical gatekeeping function of "weeding out meritless claims" and "divid[ing] the plausible sheep from the meritless goats." 573 U.S. 409, 425 (2014). The Court reiterated in *Hughes v. Northwestern University* that, in evaluating ERISA fiduciary claims, courts must recognize that "at times, circumstances facing an ERISA fiduciary will implicate difficult tradeoffs." 595 U.S. 170, 177 (2022).

Notwithstanding this guidance, many District Courts have faltered in their gatekeeper function. More than 300 ERISA excessive fee class action lawsuits have been filed in the last four years alone,[1] with many scripted, conclusory complaints riddled with distorted facts making it beyond the motion to dismiss stage. Unlocking the gates to costly class action litigation leads most often to settlements providing healthy attorney's fee awards (but critically, here, nearly no findings of substantive

---

[1] *See* Emile Hallez, 401(k) Settlements Went Way up in 2023, Investment News (Jan. 11, 2024), *available at* https://www.investmentnews.com/retirement/news/401k-settlements-went-way-up-in-2023-247954 (last visited Aug. 6, 2024).

wrongdoing in any suit).  These lawsuits have upended defined contribution plan administration, causing fiduciary liability insurance premiums to skyrocket and chilling employers' desire to offer retirement benefits at all, which is exactly what *Dudenhoffer* sought to avoid.

Plaintiffs' suit fits this bill and must be dismissed.  Plaintiffs are former Nemours employees and participants in The Nemours Foundation Section 403(b) Plan ("Plan"). Plaintiffs allege that Plan fiduciaries breached their duty of prudence under ERISA by failing to rein in recordkeeping fees and selecting expensive share classes.  The dearth of supporting allegations in the FAC is particularly troubling.  Because of the Eleventh Circuit's unique requirement that plaintiffs exhaust administrative remedies prior to pursuing an ERISA fiduciary breach claim in court, the Plan Administrator provided Plaintiffs with pertinent documents regarding Plan fees and investments over nine months *before* they drafted the FAC, but this information was largely ignored as it did not fit Plaintiffs' scripted allegations.

But Plaintiffs cannot avoid dismissal by ignoring that information, or by making generalized allegations contradicted by source documents in their possession.  The FAC's unsupported factual allegations, paired with Plaintiffs' faulty legal theories render the pleading implausible.  The Court must dismiss the FAC with prejudice.

## II.       SUMMARY OF FACTS AND PROCEDURAL HISTORY.

### A.       The Parties and the Plan.

Founded in 1936 under the terms of Alfred I. du Pont's last will and testament, Nemours is still a non-profit organization and is one of the nation's largest integrated pediatric health systems.[2]  Nemours sponsors the Plan for the benefit of its eligible employees.  *FAC*, ¶¶ 16-19.  According to the FAC, Plaintiffs are former Nemours employees who remain Plan participants.  *Id.*, ¶¶ 24-26.

The Plan is an IRC § 403(b) "defined contribution plan" covered under ERISA. *See* 29 U.S.C. § 1002(34).  *Id.*, ¶ 31.  A 403(b) plan is similar to a 401(k) plan, with the biggest difference being that a 403(b) plan is for government and non-profit employees, while a 401(k) plan is for employees in the private sector.  As with a 401(k) plan, in a 403(b) plan a participant's benefits are determined by the value of contributions made to his or her individual account.  *Id.*, ¶¶ 9, 31.

### B.       Investment Costs.

The Plan offers a broad range of diversified investment options.  *Id.*, ¶¶ 82, 123 (listing various investments); *see also Declaration of Michael E. Holzapfel* ("Holzapfel Decl."), Exs. A-F (IRS Form 5500s, describing assets held by Plan each year), which is being filed simultaneously with this Motion under a Notice of Filing.[3]  Each

---

[2] *See*     Our     Story:     The     Nemours     Children's     Journey,     available     at https://www.nemours.org/about/story.html#:~:text=1935%3A%20Through%20his%20last%20wil l,family's%20beloved%20homeland%20in%20France (last visited July 19, 2024).
[3] IRS Form 5500s are publicly-filed government records, which are among permissible documents a District Court may consider on a motion to dismiss.  *Universal Express, Inc. v. United States SEC*, 177 F.

investment options' investment manager, *i.e.*, the managers who create and manage the funds, charge fees for their services. Investment management fees are charged in the form of an expense ratio, which is a percentage of fund assets under management.[4] *See generally FAC*, ¶ 123.

Investment managers also offer funds in different share classes, which are essentially different pricing models designed to suit various investors' needs. Large, institutional investors with more buying power may qualify for share classes with lower expense ratios. *FAC*, ¶ 112. The "R" share class is an institutional share class available to qualified retirement plans. *Id.*, ¶ 123. The R share class has various sub-classes (*e.g.*, R-1 through R-6), with the R-6 sub-class typically carrying the lowest facial expense ratio. *Id*. As explained below, a major difference between share classes is the amount of "revenue share" a fund manager may agree to share with the recordkeeper, which ultimately reduces overall investment costs and benefits plan participants.

### C.    Recordkeeping Expenses and Float Revenue.

Most large retirement plans rely on a recordkeeper to provide plan-wide services such as transaction processing, government reporting, and consulting services regarding investment selection. *See id.*, ¶¶ 46, 90; *see also Holzapfel Decl.*, Exs. J-N (fee disclosures identifying "Potential General Administrative Fees and Expenses"); 29

---

App'x 52, 53 (11th Cir. 2006). The FAC also refers multiple times to – and indeed, bases almost all substantive allegations on – IRS Form 5500s. *See FAC*, ¶¶ 10, 21, 40, 59, 60, 74, 75, 80, 82, 88, 90-96.

[4] Typically, an expense ratio is expressed in basis points ("bps"), with one basis point equaling one one-hundredth of one percent (0.0001 in decimal form). For example, a fund with an expense ratio of 50 bps (expressed as 0.50%) means an investor will pay $5.00 in management fees annually for every $1,000.00 invested.

C.F.R. § 2560.404a-5(c)(2).[5]  Recordkeepers also provide individualized services, such as processing loans and qualified domestic relations orders for participants on an as-needed basis.  *See FAC*, ¶ 90; *see Holzapfel Decl.*, Exs. J-N (fee disclosures identifying "Potential Individual Fees and Expenses – applicable only to those using specific features or services"); 29 C.F.R. § 2560.404a-5(c)(3).  Recordkeepers charge for their services.  According to Plaintiffs, this may be a fixed fee (*e.g.*, $30.00 per participant per year), or an asset-based fee, whereby the recordkeeper takes a percentage of total assets in the plan, deducted ratably from participant accounts.  *See FAC*, ¶¶ 50, 51, 62.

The Nemours Plan used an asset-based fee to compensate its recordkeeper, Transamerica.  Specifically, at the start of the Class Period, Transamerica's fee was 19 bps on all Plan assets, but it decreased periodically, falling to 4.7 bps as of the most recent re-negotiation.  *Holzapfel Decl.*, Ex. R, p. R-2 (noting "Required Revenue" of 19 bps at Class Period commencement); Ex. S, p. S-1 (14 bps in 2018); Ex. T, p. T-2 (12 bps in 2019; Ex. U, p. U-1 (4.7 bps in 2021).[6]  Revenue share collected from the Plan's investments was used to pay this recordkeeping fee and, to the extent more revenue share was generated than needed to cover that fee, was rebated to the Plan participants

---

[5] Participant disclosures are the type of ERISA-required, participant-facing disclosures the Court can consider on a motion to dismiss.  *See, e.g., Probst v. Eli Lilly & Co.*, 2023 U.S. Dist. LEXIS 19172, at *13 (S.D. Ind. Feb. 3, 2023); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 U.S. Dist. LEXIS 160112, at *7 (S.D.N.Y. Sep. 18, 2019).  Moreover, Nemours provided these disclosures to Plaintiffs in the administrative review process.  *See infra* p. 8.

[6] The recordkeeping contracts are integral to the FAC and were provided to Plaintiffs during administrative review.  *Holzapfel Decl.*, Ex. W.  Thus, the contracts are properly considered at the pleading stage.  *See, e.g., Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1157 (10th Cir. 2023) (considering recordkeeping contracts when considering motion to dismiss).

as a "Plan Service Credit."  *Id*.  The Plan Service Credit was clearly disclosed to participants in the required ERISA disclosures:

> [I[f revenue is received related to an investment option, you will pay less than [the] administrative fees on your assets held in that investment option….If the revenue from an investment option exceeds the administrative fees allocable to that investment option, the excess will be applied as a Plan Service Credit….The plan service credit represents an expense refund for one or more of the investment funds offered by your plan.  When applicable, a plan service credit is added to your account and lowers the effective annual expense ratios of the investment funds for which a plan service credit applied.  Any plan service credit will be applied on your quarterly statements.

*Holzapfel Decl.*, Exs. J-N (all noting the same).  Plan Service Credits were disclosed to participants on their quarterly statements where applicable.  *Id.*, Ex. V.

Finally, recordkeepers may also receive float revenue.  Float arises when money is deposited into or withdrawn from a participant's individual account, it may pass first through an account maintained by the recordkeeper.  *FAC*, ¶ 59.  The recordkeeper may retain interest (known as "float") on a portion of that money for the short amount of time it remains in the recordkeeper's clearing account.

### D.   Allegations in the FAC.

In Count One of the FAC, Plaintiffs allege that Nemours breached ERISA's fiduciary duty of prudence in two respects.

First, Plaintiffs contend the Plan's fiduciaries caused participants to pay excessive recordkeeping fees to Transamerica.  *FAC*, ¶¶ 46-111.  Without factual support, Plaintiffs speculate that Transamerica received upwards of $74.00 per year in direct compensation, plus untold "millions" in indirect compensation (float and

revenue share), increasing total participant fees to between $250.00 and $350.00 per year. *Id.*, ¶¶ 57, 58, 60, 76, 77, 80 89, 102.

Plaintiffs compare these fees to two misguided benchmarks, claiming that the Plan should have paid no more than $25.00 to $30.00 per participant total per year. *Id.*, ¶¶ 57, 76. The first is a stipulation ("*Moitoso* Stipulation") entered into by Fidelity in a 2018 lawsuit where Fidelity stipulated that a recordkeeping fee for its own plan could have been $14.00 to $21.00 per participant per year. *Id.*, ¶¶ 100-101 (citing *Moitoso v. FMR*, 451 F. Supp. 3d 189, 214 (D. Mass. 2020)). The second is a reference to three other plans with allegedly similar participant headcounts – the Parsons Corp. Retirement Savings Plan ("Parsons Plan"), the ZF North America, Inc. 401(k) Savings Plan ("ZF Plan"), and the Discount Tire/America's Tire Retirement Plan ("Discount Tire Plan"). Purportedly these plans paid between $5.15 and $24.93 per participant per year in 2021 to their recordkeepers. *Id.*, ¶ 88.

Second, Plaintiffs identify 75 investments they contend were available to the Plan in cheaper share classes. *Id.*, ¶ 123. Plaintiffs contend that the Plan fiduciaries' alleged failure to select the least facially expensive share class is a separate breach.

In Count Two of the FAC, Plaintiffs contend that the alleged excessive recordkeeping fees and costly share classes confirm that the Plan's fiduciaries (who are not named as parties) failed to adequately monitor its service providers.

### E.    Procedural History.

Plaintiffs filed the Original Complaint on February 6, 2023. That filing was premature, as Plaintiffs were required to exhaust the Plan's administrative appeals process prior to litigation. *See* ECF Nos. 8, 13. The Court stayed proceedings pending exhaustion. *Id.*

The Plan Administrator denied Plaintiffs' appeals because Plaintiffs' allegations did not support an argument that the Plan's recordkeeping fees were excessive, or that the share class selections were imprudent under ERISA. On October 31, 2023, the Plan Administrator provided Plaintiffs a voluminous production of documents supporting its denial of Plaintiffs' first-level appeal. *Holzapfel Decl.*, Ex. W. Among those exhibits were Plan committee meeting minutes, the Plan's recordkeeping contracts with Transamerica, and plan-level and participant-level fee disclosures. *Id.*

Upon exhaustion of administrative remedies, the Court lifted the stay (ECF No. 20). Plaintiffs amended their pleading based on "documents made available to Plaintiffs" (*see FAC*, ¶¶ 77, 99), without referencing any specific source documents.

## III.    LEGAL STANDARD.

### A.    Rule 12(b)(6) Pleading Standards.

Under the pleading standard articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a complaint must "state a claim to relief that is plausible on its face." *Twombly* 550 U.S. at 570. A "plausible" claim is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. To

8

determine plausibility, the Court must disregard conclusory statements and evaluate whether the remaining well-pled factual allegations (if any) plausibly give rise to an entitlement to relief. *See id.* at 679.

### B.      ERISA's Prudence Standards.

ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Supreme Court recently reiterated that the prudence analysis on a motion to dismiss must be "context-specific," and that in evaluating ERISA fiduciary claims, courts must recognize that "at times, circumstances facing an ERISA fiduciary will implicate difficult tradeoffs." *Hughes*, 595 U.S. at 177. Thus, in evaluating a motion to dismiss, courts "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.* Given the context-specific scrutiny courts must apply, in putative ERISA class actions, Rule 12(b)(6) motions are an "important mechanism for weeding out meritless claims." *Dudenhoeffer*, 573 U.S. at 425.

### C.      Documents Considered on a Motion to Dismiss.

In conducting its inquiry, this Court is not confined to the allegations in the FAC but may also consider documents the FAC incorporates by reference, which is to say documents to which the FAC refers, or whose contents the FAC describes. *See Moog Mktg., Inc. v. TD Bank, N.A.*, 2019 U.S. Dist. LEXIS 18368, at *2-3 (M.D. Fla. Feb. 5, 2019) (citations omitted). Critically, plaintiffs cannot avoid dismissal by simply

omitting direct references to integral documents they know contradict the complaint's allegations. *See, e.g., Dimanche v. Lake County Sheriff's Office*, 2012 U.S. Dist. LEXIS 59665, at *3 n.1 (M.D. Fla. Apr. 30, 2012) (collecting cases). The FAC's few coy references to "documents made available to Plaintiffs thus far" (*FAC*, ¶¶ 77, 99) pertain to the administrative record compiled prior to litigation. That Plaintiffs either ignored, or craftily avoided these documents, does not mean the Court cannot consider them.

This principle is of utmost importance here, given the Eleventh Circuit's unique requirement that plaintiffs bringing fiduciary breach claims must exhaust administrative remedies prior to commencing suit. The purpose of that requirement is to engage the claimant and plan fiduciaries in a review process designed to, *inter alia*, streamline disputes before heading to court. *See Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1330 (11th Cir. 2006). If Plaintiffs are permitted to ignore and distort the documents received during that process, the purpose of exhaustion is gutted.

Indeed, even courts outside the Eleventh Circuit that do not apply the exhaustion doctrine to fiduciary breach cases recognize that ERISA's extensive disclosure requirements, such as the requirement to send annual fee disclosures and file annual IRS Form 5500s, arm Plaintiffs with circumstantial evidence that can – and must – be used to create a plausible inference that the fiduciaries' process was deficient. *See Matney*, 80 F.4th at 1157; *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168-69 (6th Cir. 2022); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018).

10

IV.        **LEGAL ARGUMENT.**

A.      **Plaintiffs' Recordkeeping Claim Fails.**

The Eleventh Circuit has not had the opportunity to consider how the foregoing pleading standards apply to a recordkeeping claim.  However, many Courts of Appeals have held that a plausible claim for excessive recordkeeping fees requires plaintiffs to show that the defendant's fees were excessive compared to fees paid by plans of a similar size for the same or similar services (*i.e.*, "meaningful benchmarks").  *See, e.g., Matney*, 80 F.4th at 1157; *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 580 (7th Cir. 2022); *CommonSpirit*, 37 F.4th at 1169.   Plaintiffs seek to meet this standard by estimating the Plan's recordkeeping fees from the Plan's IRS Form 5500s and comparing those fees to: (1) the *Moitoso* Stipulation; and (2) the direct recordkeeping compensation reported by the Parsons, ZF, and Discount Tire Plans ("Comparator Plans") on their IRS Form 5500s. None of these are meaningful benchmarks.

1.      **The *Moitoso* Stipulation is not a meaningful benchmark.**

Plaintiffs' interpretation of the *Moitoso* Stipulation as establishing reasonableness for all excessive fee lawsuits (FAC, ¶ 102) fails.  In *Moitoso*, Fidelity resolved a discovery dispute by stipulating that the value of the recordkeeping services it provided to its *own plan* was $14.00 to $21.00 during the relevant time period. *Holzapfel Decl.*, Ex. Q.  But, the *Moitoso* Stipulation states expressly that it is "for the purposes of the [*Moitoso*] litigation only," and that the parties agree not to "contest the

11

validity of the stipulation[] *in the context of this litigation only*." *Id.* (emphasis added).  It is axiomatic that judicial admissions and stipulations are binding for purposes of the case in which they are made, not in separate or subsequent cases.  *See Starbuck v. R.J. Reynolds Tobacco Co.*, 349 F. Supp. 3d 1223, 1235 (M.D. Fla. 2018).  The *Moitoso* Stipulation is not relevant in any other lawsuit, much less lawsuits involving *different plans,* serviced by *different recordkeepers,* pursuant to *different contracts,* for *different services*.

It is not surprising, therefore, that a majority of District Courts have rejected the *Moitoso* Stipulation as a valid benchmark at the motion to dismiss stage.  *See, e.g., Mateya v. Cook Grp. Inc.*, 2023 U.S. Dist. LEXIS 124838, at *17-18 (S.D. Ind. June 16, 2023); *Williams v. Centene Corp.*, 2023 U.S. Dist. LEXIS 58066, at *13 (E.D. Mo. Mar. 31, 2023); *Sigetich v. Kroger Co.*, 2023 U.S. Dist. LEXIS 40359, at *24 n.6 (S.D. Ohio Mar. 9, 2023); *Fritton v. Taylor Corp.*, 2022 U.S. Dist. LEXIS 222996, at *25-26 (D. Minn. Dec. 12, 2022); *Johnson v. PNC Fin. Servs. Grp.*, 2021 U.S. Dist. LEXIS 149408, at *14 (W.D. Pa. Aug. 3, 2021); *Wehner v. Genentech, Inc.*, 2021 U.S. Dist. LEXIS 26227, at *19 (N.D. Cal. Feb. 9, 2021).  This Court should do the same.

### 2.    The Comparator Plans are not meaningful benchmarks.

The Court must disregard Plaintiffs' comparisons of the Nemours Plan to the Comparator Plans because the estimated fees at the heart of those comparisons are skewed and mismatched.  And even if they were not, Plaintiffs have not alleged

sufficient facts to show that the Comparator Plans received materially similar services. Both of these flaws are independent bases for dismissal.

> a.   Plaintiffs' skewed fee estimates are not apples-to-apples comparisons.

Plaintiffs improperly estimated the Plan's fees and the fees for the Comparator Plans.  For the Plan, Plaintiffs calculated average fees of $250.00 to $350.00 per participant per year by adding: (1) direct compensation paid to Transamerica reported in Schedule C of the Plan's IRS Form 5500s,[7] and (2) estimated indirect compensation paid to, and float income retained by, Transamerica.[8]  *FAC*, ¶¶ 80, 99, 102.  For the Comparator Plans, however, Plaintiffs calculated estimated fees simply from direct compensation paid to those plans' recordkeepers, as reported on IRS Form 5500s. This manipulation of data destroys the validity of Plaintiffs' comparisons.

First, float income is not appropriately included as indirect compensation. Plaintiffs refer to float merely as a way to inflate their estimate of the Plan's fees. Plaintiffs wrongly characterize float dollars paid to Transamerica as though they came from the participants' pockets.  *FAC*, ¶¶ 58-61.  But participants have no interest in float income because the law does not consider it a plan asset.  *See Kelley v. Fid. Mgmt.*

---

[7] The FAC also alleges that Nemours "admitted" in the administrative claims process that Plan participants paid Transamerica between $60.84 and $76.64 per year between 2017 and 2021, and $27.53 in 2022 (*i.e.*, within Plaintiffs' "range of reasonableness").  *See FAC*, ¶ 78.  However, Plaintiffs maintain that these amounts were much higher, based on their interpretation of the IRS Form 5500s. *See id.*, ¶ 79.  In either case, Plaintiffs' allegations tell the Court nothing about whether the fees were excessive relative to the services rendered because Plaintiffs do not assert any meaningful benchmarks.
[8] The allegation that indirect compensation pushed Transamerica's recordkeeping fees from the Nemours Plan to between $250.00 and $350.00 per annum is not borne out *anywhere* in the IRS Form 5500s, nor does the FAC explain how Plaintiffs calculated these figures.  Plaintiffs conjured these numbers out of thin air.

*Trust Co. (In re Fid. ERISA Float Litig.)*, 829 F.3d 55, 60 (1st Cir. 2016); *Tussey v. ABB, Inc.*, 746 F.3d 327, 340 (8th Cir. 2014).  Accordingly, the Court cannot consider float in indirect compensation.  *See Sealy v. Old Dominion Freight Line, Inc.,* 2024 U.S. Dist. LEXIS 88092, at *18 (M.D.N.C. May 16, 2024) (refusing to credit similar float allegations and observing lack of legal support for this theory).

Plaintiffs' float theory is also entirely speculative.  Plaintiffs refer to the financial statements attached to the Plan's 2022 IRS Form 5500, which reflect $112,655,918.00 in contributions to the Plan and $58,914,259.00 in deductions/withdrawals.  *FAC*, ¶ 60; *Holzapfel Decl.*, Ex. F, p. F-14.  Plaintiffs then take a pure guess that Transamerica must have earned at least one percent interest on all $171 million and "pocketed" $1.71 million in 2022 from float alone.  *FAC*, ¶ 60.  Such speculation is inherently implausible.  *See Sealy*, 2024 U.S. Dist. LEXIS 88092, at *18 (refusing to credit similarly speculative statement regarding float).  It is also contradicted by the IRS Form 5500s on which Plaintiffs rely, which disclosed float revenue (service code 62) as part of Transamerica's *direct* compensation.  *See infra* p. 16.  By relying on that direct compensation *and* estimating float as indirect compensation, Plaintiffs double dip on float revenue to manipulate their fee comparisons.

Second, Plaintiffs did not include any indirect compensation in the estimated fees for the Comparator Plans.  Stated otherwise, Plaintiffs omit an entire revenue stream for the Comparator Plans that was included in the estimated fees for the Nemours Plan.  This is not harmless as the recordkeepers for the Comparator Plans all received indirect compensation as well.  *Holzapfel Decl.*, Ex. G, p. G-5; Ex. H, p. H-

14

5; Ex. I, p. I-5. For example, Schedule C of the ZF Plan's IRS Form 5500 identifies more than 200 investments from which Fidelity may have received revenue share, none of which is accounted for in the FAC. *Id.*, Ex. H, p. H-7 – H-82.

In sum, the FAC's misleading, apples-to-oranges comparisons are not meaningful benchmarks on which the Court may rely to infer that the Plan's fees are excessive. *See Matousek*, 51 F. 4th at 279 (reasoning that comparisons between total fees for the plan at issue, to less than total fees for the benchmark, tell the Court very little and are not meaningful benchmarks); *see also Matney,* 80 F.4th at 1155; *CommonSpirit*, 37 F.4th at 1169.

b. The Comparator Plans received different services from different service providers.

Even if the Court were to overlook the fact that Plaintiffs' fee estimates are flawed, the Comparator Plans are not meaningful benchmarks because they did not receive similar services from the same recordkeeper. *See infra* p. 16.

Compensation reported in Schedule C of the IRS Form 5500, the source of Plaintiffs' fee allegations, encompasses more than just recordkeeping fees; it includes *every* dollar paid to the recordkeeping entity.[9] This is borne out in the service and compensation codes listed in the IRS Form 5500s for the Plan and Comparator Plans. Schedule C of the IRS Form 5500 requires disclosure of service and compensation codes to provide a high-level understanding of what different services were rendered

---

[9] Critically, as is true here, recordkeepers often perform services that go beyond basic recordkeeping, meaning their reported compensation would be higher.

in exchange for the disclosed compensation.  Plaintiffs list those codes perfunctorily in the FAC (and often incorrectly),[10] neglecting analysis of the different codes.

The Schedule C disclosures for the Plan and Comparator Plans in 2021 are:

| Service Codes Identified By Plaintiffs (per Form 5500s, Schedule C) | Nemours Plan | Parsons Plan | ZF Plan | Discount Tire Plan |
|---|---|---|---|---|
| 12 – Claims processing | X | | | |
| 13 – Contract admin. | | X | | |
| 15 – Recordkeeping and info mgmt. | X | | | X |
| 28 – Investment mgmt. | X | | | |
| 37 – Participant loan processing | X | X | X | X |
| 38 – Participant communications | X | | | |
| 50 – Direct payment from plan | X | X | | X |
| 54 – Sales loads | X | | | |
| 59 – Shareholder servicing fees | X | | | |
| 60 – Sub-transfer agency fees | | | X | |
| 61 – Finders fees/placement fees | X | | | |
| 62 – Float revenue | X | | | |
| 63 – 12b-1 fees | X | | | |
| 64 – Recordkeeping fees | X | X | X | X |
| 65 – Account maintenance | X | | X | |
| 71 – Securities brokerage commissions and fees | | | X | |

Viewed side-by-side, it is clear that the services included in Transamerica's compensation differed from the services included in the Comparator recordkeepers' compensation.  For example, Transamerica collected various investment-related fees

---

[10] Paragraph 94 alleges that all plans received "contract administration" fees, memorialized by service code 13.  *FAC*, ¶ 94.  According to the table in Paragraph 88, however, that is incorrect, as only the Parsons Plan received contract administration fees.  *Id.*, ¶ 88.

16

(*i.e.*, sales load, 12b-1 fees, and investment management fees), fees for claims processing, and fees for participant communications, whereas the Comparator Plans' recordkeepers did not.  Comparison across plans receiving dissimilar services is not meaningful to the Court.  *See, e.g., Ruebel v. Tyson Foods, Inc.,* 2024 U.S. Dist. LEXIS 139618, at *10 (W.D. Ark. Aug. 6, 2024) (rejecting a similar claim when the plan's participant disclosures described additional recordkeeping services not offered by plaintiffs' comparator plans); *Lard v. Marmon Holdings, Inc.*, 2023 U.S. Dist. LEXIS 169206, at *10 (N.D. Ill. Sep. 22, 2023) (rejecting plaintiff's comparison of defendant plan's fees to other plans' fees, and noting that defendant's IRS Form 5500 listed several more service codes than the comparators' IRS Form 5500s); *Dover v. Yanfeng US Auto. Interior Sys. I LLC*, 563 F. Supp. 3d 678, 688-89 (E.D. Mich. 2021) (refusing to credit as plausible the same approach Plaintiffs employ here, where Schedule C compensation clearly includes higher fees for additional services); *see also Matousek*, 51 F.4th at 279 (explaining that IRS Form 5500s disclose total compensation, not just recordkeeping fees, and holding that, for a benchmark to be "sound and meaningful," it must provide a like-for-like comparison (*i.e.*, recordkeeping-for-recordkeeping)).

Further underscoring Plaintiffs' manipulation of the IRS Form 5500s, the Parsons Plan's Schedule C identifies two recordkeepers: the one Plaintiffs identify erroneously in the FAC as "Prudential" (the correct name on the IRS Form 5500 is Principal Life Insurance Company), who received $345,582.00 in direct compensation (the sum reflected in the FAC's Paragraph 88 table), and Wells Fargo, who received

$355,811.00 in direct compensation. Thus, direct recordkeeping compensation paid by the Parsons Plan was more than double what the FAC alleges.

In the end, the Court is left to engage in guesswork as to what the Nemours Plan paid versus what the Comparator Plans paid for recordkeeping services, which cannot translate to a plausible claim. *See Matousek*, 51 F.4th at 280; *accord Mateya*, 2023 U.S. Dist. LEXIS 124838, at *24 ("At bottom, the problem with Mateya's complaint is that it attempts to compare numbers that mean different things. To state a claim, Mateya needs to compare, within a given year, direct fees to direct fees, indirect fees to indirect fees, or a combination of direct and indirect fees to a combination of direct and indirect fees. Comparing the direct and indirect fees of the Cook Plan over multiple years to just a single year of direct fees from other plans will not suffice.").

### 3.   Plaintiffs' remaining allegations are generally implausible.

The Court must also disregard Plaintiffs' attempt to prop up their contrived, inflated comparisons with two generic allegations, namely: (1) revenue sharing is an improper way to "hide" excessive fees, and (2) Plan fiduciaries must not have conducted recordkeeping services requests for proposals ("RFP"). *FAC*, ¶¶ 62-78.

First, Plaintiffs' allegation that revenue sharing can be problematic and, in some cases, can lead to hidden fees is speculative and says nothing specific about *this* case. Plaintiffs concede that revenue sharing is permissible under ERISA. *Id.*, ¶¶ 63-65. Indeed, as expanded upon below, revenue sharing is a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." *Tussey*, 746 F.3d at 336. And Transamerica discloses its revenue sharing arrangements

18

to participants; nothing is concealed. *Holzapfel Decl.* Exs. J-N. Without a well-pled allegation that revenue sharing actually *caused* the issues raised in the FAC, there can be no imprudence claim.

Second, Plaintiffs' focus on the alleged infrequency of RFPs is baseless because nothing in ERISA requires periodic competitive bidding. The absence of an RFP does not, without more, create a plausible inference that plan fiduciaries acted imprudently. *See Matney v. Barrick Gold of N. Am., Inc.*, 2022 U.S. Dist. LEXIS 73479, at *32-33 (D. Utah Apr. 21, 2022), *aff'd* 80 F.4th 1136 (2023). That is especially true here where the fee decreased throughout the Class Period (from 19 bps to 4.7 bps). *See supra* p. 5. Plaintiffs' generalized claim that plan fiduciaries failed to conduct an RFP does not spare the recordkeeping claim from dismissal.

### B.   Plaintiffs' Share Class Claim Fails.

#### 1.   Plaintiffs do not allege that their preferred, lower cost share classes were available to the Plan.

Because cheaper share classes are usually available to investors with more bargaining power (*i.e.*, more assets to invest), they typically have minimum investment thresholds. *See Forman v. TriHealth, Inc.*, 40 F.4th 443, 447 (6th Cir. 2022). Therefore, to plausibly plead a breach of fiduciary duty by failing to opt for a cheaper share class, a plaintiff must allege that the preferred share class was actually available to the Plan – *i.e.*, that the Plan had sufficient assets in the investment to meet the minimum. *See, e.g., Johnson v. Parker-Hannifin*, 2023 U.S. Dist. LEXIS 214747, at *27 (N.D. Ohio Dec. 4, 2023) (rejecting generic allegation that "lower-fee shares could have been obtained

19

due to the Plan's size" without further factual enhancement showing those options were actually available to the plan).

Plaintiffs do not even attempt to plead that their preferred share classes were available to the Plan during the Class Period, and for good reason. The majority of the 75 challenged funds in the Paragraph 123 table – namely the Fidelity Funds (with the exception of the Fidelity Index Fund) and Vanguard Funds – had very few assets.[11] For example, according to the IRS Form 5500s, the Plan had only $1,064,293.00 in the admiral share class of the Vanguard Balanced Index Fund (#68 in the table). *Holzapfel Decl.*, Ex. F, p. F-26. According to that fund's prospectus, the institutional share class – Plaintiffs' preferred share class – has a $5 million investment minimum. *Id.*, Ex. O.[12] Indeed, the Plan's 2022 IRS Form 5500 shows that most of the challenged investments had well below $1 million in assets, and some had only a few *thousand* dollars. *Id.*, Ex. F, p. F-23 – F-27.

Other funds highlighted in the FAC were not even available to the Plan, regardless of investment minimums. For example, Plaintiffs claim it was imprudent for the Plan to offer the Fidelity 500 Index Fund, which has a 0.15% expense ratio, over the Fidelity *Flex* 500 Index Fund, which Plaintiffs claim was free (0.00% expense

---

[11] Plaintiffs were advised during the administrative appeals process that only 13 of the 75 funds listed in the FAC's Paragraph 123 table were open for investment during the Class Period. *Holzapfel Decl.*, Ex. W. The other 62 funds are legacy funds that have been closed to new money since January 1, 2010. *Id.* Plaintiffs cannot turn a blind eye to facts they knew before they drafted the FAC.

[12] The Court may consider publicly filed prospectuses for the funds which Plaintiffs contend were offered in imprudent share classes. *See, e.g., Matney*, 80 F.4th at 1150; *Riley v. Olin Corp.*, 2023 U.S. Dist. LEXIS 11771, at *20 (E.D. Mo. Jan. 24, 2023); *Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1302 (D. Minn. 2021).

ratio). The prospectus reveals that the Fidelity Flex Fund "is available only to certain fee-based accounts and advisory programs offered by Fidelity." *Id.*, Ex. P.

Absent well-pled facts supporting Plaintiffs' bald assumption that the Plan actually qualified for the preferred share classes associated with the 75 challenged funds, their imprudence claim is implausible.

### 2. The FAC does not account for the benefits the challenged share classes conferred.

For certain share classes, fund managers allocate a portion of the investment's expense ratio to recordkeepers to cover the cost of participant-level services the fund manager would otherwise have to perform itself. *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013). This practice is called revenue share. Documents provided to Plaintiffs during the administrative claims review – but ignored in the FAC – confirm that revenue share collected from the Plan's investments was used to pay the Plan's recordkeeping fee. To the extent more revenue share was generated than needed to cover that fee, it was rebated to the Plan participants as a Plan Service Credit. *Holzapfel Decl.*, Ex. R, p. R-3 (recordkeeping contract stating that "Transamerica expects to receive certain revenue from the Investment Options available within the Plan … which will be used to offset the Required Revenue … that might otherwise be payable to [Transamerica] for providing the Basic Services under" the recordkeeping agreement, and that Transamerica will apply a "Plan Service Credit" to participants' accounts to ensure that the collected revenue does not exceed the contractual recordkeeping fee); Ex. S, p. S-2 (same); Ex. T, p. T-3 (same); Ex. U,

21

p. U-2 (same); Exs. J-N (participant disclosures explaining Plan Service Credit); Ex. V, p. V-5 (example statement noting a "Plan Service Credit" of $34.46 back to Plaintiff Cannarozzo in third quarter of 2022).

Thus, the revenue share collected here is not an investment expense at all; it is part of the recordkeeper's compensation. *Leimkuehler*, 713 F.3d at 909 (noting that the more a fund pays a recordkeeper in revenue sharing, the less the recordkeeper charges plan participants for recordkeeping services). The appropriate investment fee to look at when considering the most advantageous share class, then, is the *net* expense ratio, which is the investment's total expense ratio, minus any revenue share. *See England v. Denso Int'l Am., Inc.*, 2023 U.S. Dist. LEXIS 131386, at *13 (E.D. Mich. Jul. 28, 2023) ("The net expense ratio is the total expense ratio minus the revenue sharing that is rebated to participants.").

Plaintiffs do not do so here. Indeed, despite recognizing that the net expense ratio is the salient fee to consider (*see FAC*, ¶ 123, listing the net expense ratio of the "lower cost" share class), and recognizing the flow of revenue share to the recordkeeper when it suits them for their recordkeeping claim (*id.*, ¶¶ 58, 62, 82), Plaintiffs refer only to the *gross* expense ratio for the challenged investments. Thus, Paragraph 123 does not offer an apples-to-apples comparison. Quite the opposite, it misleads the Court by showing the total, higher cost for the challenged share class alongside the lower net expense ratio for the proposed alternative share class.

To illustrate, consider the revenue share alleged for the eight funds identified in Paragraph 82. When these funds' gross expense ratios (as noted in Paragraph 123) are

adjusted to deduct revenue sharing (as noted in Paragraph 82), their net expense ratios are either equal to or better than the expense ratios of Plaintiffs' preferred share class:

| Plan Investment and Share Class | Expense Ratio (FAC ¶ 123) | Revenue Sharing Identified in FAC ¶ 82 | Net Expense Ratio of Challenged Share Class | Plaintiffs' Preferred Share Class | Net Expense Ratio of Preferred Share Class | Benefit of Plan Share Class Over Preferred Share Class |
|---|---|---|---|---|---|---|
| Allspring Special Small Cap Value A | 125 bps | 55 bps | 70 bps | R6 | 83 bps | **13 bps** |
| American EuroPacific Growth R5 | 52 bps | 5 bps | 47 bps | R6 | 47 bps | **Neutral** |
| Carrillon Eagle Mid Cap Growth R5 | 73 bps | 20 bps | 53 bps | R6 | 64 bps | **11 bps** |
| DFA Emerging Markets I | 36 bps | 2 bps | 34 bps | II | 34 bps | **Neutral** |
| Dodge & Cox Income I | 41 bps | 8 bps | 33 bps | X | 33 bps | **Neutral** |
| Hartford Intl Opportunities R5 | 80 bps | 10 bps | 70 bps | R6 | 70 bps | **Neutral** |
| MFS Growth R3 | 85 bps | 50 bps | 35 bps | R6 | 51 bps | **16 bps** |
| MFS Mid Cap Value R3 | 99 bps | 50 bps | 49 bps | R6 | 62 bps | **13 bps** |

While the Eleventh Circuit has not had the opportunity to analyze this issue, the Tenth Circuit recently affirmed dismissal of a similar share class claim and

23

provided a thorough overview of relevant appellate guidance supporting its decision. *See Matney*, 80 F.4th at 1146-52. The Tenth Circuit held that the flaw in the plaintiffs' share class claim was that the challenged expense ratios pled in the complaint did not take revenue sharing credits into account, even though revenue sharing was reflected in judicially noticeable documents. *See id.* at 1151. The FAC suffers from the same fatal flaw. Absent an apples-to-apples comparison of "net expense ratio" to "net expense ratio," Plaintiffs' share class claim is implausible and must be dismissed.[13]

## V.      CONCLUSION.

For the foregoing reasons, the court should dismiss the FAC with prejudice, as Plaintiffs have already been permitted to amend their complaint once, with the benefit of the entire administrative record at their disposal. *See Thompson v. Dixon*, 2023 U.S. Dist. LEXIS 195164, at *13 (N.D. Fla. Oct. 1, 2023).

Dated: August 13, 2024

Respectfully submitted,

/s/ *Lindsay D. Swiger*
Lindsay Dennis Swiger, Esq.
Howard Shapiro, Esq.
Michael E. Holzapfel, Esq.
Adam R. Carlisle, Esq.

---

[13] The Court must also dismiss Plaintiffs' Count Two because a failure to monitor claim relies on a derivative theory of liability, dependent upon an actionable underlying ERISA claim for breach of fiduciary duty. *See Stengl v. L3Harris Techs., Inc.*, 2023 U.S. Dist. LEXIS 50692, at *35 (M.D. Fla. Mar. 24, 2023). For the reasons set forth above, the FAC's recordkeeping and share class allegations fail to state a claim for fiduciary imprudence, and otherwise contains zero facts to identify any deficiencies in the Plan's monitoring process itself. *See Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1062-67 (M.D. Tenn. 2018) (dismissing plaintiffs' duty to monitor claim when the complaint was devoid of facts about the fiduciary monitoring process, how it was deficient, or how it harmed plaintiffs).

24

## LOCAL RULE 3.01(G) CERTIFICATION

Counsel for The Nemours Foundation conferred with Plaintiffs' counsel regarding this motion and confirmed that Plaintiffs are opposed to the relief sought herein.

Dated: August 13, 2024

Respectfully submitted,
/s/ *Lindsay D. Swiger*

JACKSON LEWIS P.C.
Attorney for Defendant

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via CM/ECF.

/s/ *Lindsay Dennis Swiger, Esq.*

JACKSON LEWIS P.C.
Attorney for Defendant

26